# IN THE SUPREME COURT OF IOWA

No. 15–0695

Filed June 30, 2017

Amended September 26, 2017

**CHRISTOPHER J. GODFREY,**

Appellant,

vs.

**STATE OF IOWA; TERRY BRANSTAD,** Governor of the State of Iowa, Individually and in his Official Capacity; **KIMBERLY REYNOLDS,** Lieutenant Governor of the State of Iowa, Individually and in her Official Capacity; **JEFFREY BOEYINK,** Chief of Staff to the Governor of the State of Iowa, Individually and in his Official Capacity; **BRENNA FINDLEY,** Legal Counsel to the Governor of the State of Iowa, Individually and in her Official Capacity; **TIMOTHY ALBRECHT,** Communications Director to the Governor of the State of Iowa, Individually and in his Official Capacity; and **TERESA WAHLERT,** Director, Iowa Workforce Development, Individually and in her Official Capacity,

Appellees.

---

Appeal from the Iowa District Court for Polk County, Brad McCall, Judge.

Plaintiff seeks interlocutory review of district court's grant of summary judgment. **AFFIRMED IN PART AND REVERSED IN PART.**

Roxanne Barton Conlin of Roxanne Conlin & Associates, P.C., Des Moines, for appellant.

Jeffrey S. Thompson, Solicitor General, and Jeffrey C. Peterzalek, Assistant Attorney General, for appellees.

Alan R. Ostergren, Muscatine, for amicus curiae Iowa County Attorneys Association.

Richard J. Sapp and Ryan G. Koopmans (until withdrawal) of Nyemaster Goode, P.C., Des Moines, for amici curiae Iowa League of Cities, Iowa State Association of Counties, Iowa Communities Assurance Pool and Iowa Association of School Boards.

**APPEL, Justice.**

In this case, we are called upon to determine whether the equal protection and due process provisions of the Iowa Constitution provide a direct action for damages in the context of an employment dispute between an Iowa Workers' Compensation Commissioner and various state officials, including the Governor, the Lieutenant Governor, the Governor's chief of staff, the Governor's legal counsel, the Governor's communication director, and the director of Iowa Workforce Development.

The district court granted summary judgment in favor of the defendants on the plaintiff's claims. We granted interlocutory appeal. For the reasons expressed below, we reverse in part and affirm in part the judgment of the district court.

## I. Factual and Procedural Background.

This case involves claims brought against various state officials for damages related to public employment. The petition as amended named the State of Iowa and individual defendants Terry Branstad, Kimberly Reynolds, Jeffrey Boeyink, Brenna Findley, Timothy Albrecht, and Teresa Wahlert. Christopher J. Godfrey stated in the petition that he was appointed Workers' Compensation Commissioner in 2006 for a partial term and then was subsequently appointed for a full term by Governor Chet Culver in 2009. Godfrey pled that the position of commissioner was statutorily defined as a six-year term, whereas the Iowa Constitution establishes a four-year term for the governorship. Since July of 2008 until the incidents complained of by Godfrey, Godfrey alleged that his salary was $112,068.84 a year, near the maximum in the statutorily set salary range of $73,250–$112,070. *See* 2008 Iowa Acts ch. 1191, § 14(1), (5).

Godfrey alleged in the petition that defendant Branstad, prior to taking office, demanded Godfrey's resignation by a letter dated December 3, 2010. Godfrey, however, asserted he refused to resign, claiming that his position was quasi-judicial, intended to be nonpartisan, and insulated from politics because of the two-year difference in terms between the commissioner (six years) and the Governor (four years). Godfrey's petition described several meetings with Branstad, Branstad's staff, and some of the other individual defendants in which Godfrey was pressured to resign. Godfrey alleges that as a result of his refusal to resign, he was punished by having his salary reduced to the statutory minimum of $73,250. Godfrey claims he suffered other retaliation in the workplace at the hands of the defendants.

At issue in this interlocutory appeal are four counts alleging violation of due process and equal protection provisions of the Iowa Constitution.[1] In Count VI, Godfrey alleges defendants deprived him of his constitutionally protected property interest in his salary without due process of law because of partisan politics and/or his sexual orientation in violation of article I, section 9 of the Iowa Constitution. In Count VII, Godfrey alleges the defendants damaged his protected liberty interest in his reputation without due process of law in violation of article I, section 9 by falsely claiming poor work performance. In Count VIII, Godfrey states the State of Iowa deprived Godfrey of equal protection of the laws in violation of article I, section 6 by discriminating against Godfrey because of his sexual orientation. Finally, in Count IX, Godfrey alleges

---

[1]After filing this interlocutory appeal, Godfrey voluntarily dismissed counts XII, XIII, XIV, XV, XVII, XVIII, and a second count labeled "XIV." These were defamation counts brought against various individual defendants. No other counts were dismissed, including the counts raising *Bivens*-type claims against the individual defendants.

the individual defendants deprived him of equal protection of the laws by treating homosexual appointed state officers or homosexual individuals differently than heterosexual appointed state officers or heterosexual individuals, also in violation of article I, section 6 of the Iowa Constitution. Under all these claims, Godfrey asks for actual damages, punitive damages, attorney's fees, court costs, and interest.

The defendants moved for summary judgment. According to the defendants, they were entitled to summary judgment because there is no private cause of action for money damages for violation of article I, sections 6 and 9 of the Iowa Constitution. In the alternative, the defendants argued that Godfrey's claims were preempted by the Iowa Civil Rights Act, Iowa Code chapter 216 (2009).

The district court granted summary judgment for the defendants on the Iowa constitutional claims. The district court explained that it considered the motion for summary judgment as a motion to dismiss because neither party asserted any particular facts upon which the district court should base its decision. The district court noted that federal precedent in *Davis v. Passman*, 442 U.S. 228, 99 S. Ct. 2264 (1979), and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971), appeared to support a cause of action for due process violations in a wrongful termination case. Further, the district court recognized that "[s]ignificant public policy arguments favor recognition of such claims." Nonetheless, the district court found that a recent unpublished court of appeals decision holding there are no private causes of action for violations of the Iowa Constitution was dispositive and dismissed Godfrey's constitutional claims. *See Conklin v. State*, No. 14–0764, 2015 WL 1332003, at *5 (Iowa Ct. App. Mar. 25, 2015).

Godfrey applied for interlocutory review. We granted the application. For the reasons expressed below, a majority of the court concludes that *Bivens* claims are available under the Iowa Constitution and that the claims raised by plaintiff in Counts VI and VII were improperly dismissed. On the question of whether the Iowa Civil Rights Act provides an adequate remedy sufficient to stay any *Bivens*-type claim, a majority concludes that the remedy provided by chapter 216 is adequate under the facts and circumstances of this case, and that as a result, Counts VIII and IX of the plaintiff's complaint were properly dismissed.

## II. Standard of Review.

A motion for summary judgment is appropriately granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). "We review the legal issues necessary for resolution of the constitutional claims presented within the context of the summary judgment proceeding de novo." *Varnum v. Brien*, 763 N.W.2d 862, 874 (Iowa 2009); *accord Kistler v. City of Perry*, 719 N.W.2d 804, 805 (Iowa 2006).

Generally, our review on a motion to dismiss is for correction of errors at law. *Hedlund v. State*, 875 N.W.2d 720, 724 (Iowa 2016); *Mueller v. Wellmark, Inc.*, 818 N.W.2d 244, 253 (Iowa 2012). To the extent that we review constitutional claims within a motion to dismiss, our review is de novo. *McGill v. Fish*, 790 N.W.2d 113, 116–17 (Iowa 2010); *State v. Taeger*, 781 N.W.2d 560, 564 (Iowa 2010). If the petitioner fails to state a claim upon which relief may be granted, we will affirm a grant of a motion to dismiss. *Hedlund*, 875 N.W.2d at 724; *King v. State*, 818 N.W.2d 1, 8 (Iowa 2012). In ruling on a motion to dismiss,

we accept all well-pled facts in the petition as true. *Shumate v. Drake Univ.*, 846 N.W.2d 503, 507 (Iowa 2014); *Geisler v. City Council of Cedar Falls*, 769 N.W.2d 162, 165 (Iowa 2009).

**III. Claims for Monetary Damages Under Article I, Section 6 and Article I, Section 9 of the Iowa Constitution.**

**A. Positions of the Parties.**

1. *Godfrey.* Godfrey argues that article I, section 6 and article I, section 9 of the Iowa Constitution are self-executing. As a result, according to Godfrey, no implementing legislation is necessary for Godfrey to bring a claim against the defendants for monetary damages under the specific Iowa constitutional provisions involved in this case.

Godfrey cites United States Supreme Court precedent as providing persuasive reasoning that some constitutional provisions are self-executing. The United States Supreme Court declared in *Davis v. Burke* that a constitutional provision may be said to be "self-executing" if it "supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced." 179 U.S. 399, 403, 21 S. Ct. 210, 212 (1900). According to Godfrey, the reasoning in *Davis* supports his position that the due process and equal protection provisions of article I, sections 6 and 9 of the Iowa Constitution fall within the self-executing category.

Godfrey further argues that it would be illogical for the fundamental principles in these key Iowa constitutional provisions to depend upon legislative action for enforcement. In support of his argument, Godfrey cites passages in *Varnum* where we stated that the purpose of constitutional provisions such as the equal protection clause was to place certain subjects beyond the reach of the elected branches and instead entrust their enforcement to the courts. 763 N.W.2d at 875–

76. Godfrey further cites *Marbury v. Madison,* in which Justice Marshall wrote, "The very essence of civil liberty certainly consists of the right of every individual to claim the protection of the laws, whenever he receives an injury." 5 U.S. 137, 163 (1803). Thus, according to Godfrey, a requirement of legislation to enforce fundamental nonmajoritarian constitutional rights makes no sense.

Godfrey recognizes that article XII, section 1 of the Iowa Constitution provides that the legislature "shall pass all laws necessary to carry [the] constitution into effect." Godfrey emphasizes the word "necessary" in article XII, section 1. Godfrey argues that no legislation is necessary to enforce the due process and equal protections clauses of the Iowa Constitution. He cites appellate state court cases that have held that *Bivens*-type remedies are available notwithstanding similar language in their state constitutions. *See, e.g., Widgeon v. E. Shore Hosp. Ctr.,* 479 A.2d 921, 930 (Md. 1984); *Peper v. Princeton Univ. Bd. of Trs.,* 389 A.2d 465, 476 (N.J. 1978).

Turning to more modern federal cases, Godfrey draws support from *Bivens,* 403 U.S. 388, 91 S. Ct. 1999. In *Bivens,* the United States Supreme Court recognized a private cause of action for damages for violation of the search and seizure provisions of the Fourth Amendment. *Id.* at 397, 91 S. Ct. at 2005.

In addition to federal cases, Godfrey looks for common law support of his claims. He argues that the Restatement (Second) of Torts and English common law principles are embraced in section 874A of the Restatement (Second) of Torts, which provides,

> When a legislative provision [defined in comment *a* as including constitutional provisions] protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if

> it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using suitable existing tort action or a new cause of action analogous to an existing tort action.

Restatement (Second) of Torts § 874A & cmt. *a*, at 301 (Am. Law Inst. 1979) [hereinafter Restatement (Second)]. Godfrey notes many state courts that have found state constitutional provisions self-enforcing have relied upon this section of the Restatement (Second) as authoritative.

Echoing Justice Harlan's concurrence in *Bivens,* Godfrey also contends that English common law long recognized a cause of action for damages for violation of rights secured by fundamental charters and constitutions. Justice Harlan also noted that if an explicit congressional authority were required to authorize a damage remedy under the Constitution, then an explicit authority should also be required for equitable relief. *Bivens*, 403 U.S. at 405, 91 S. Ct. at 2009 (Harlan, J., concurring).

Additionally, Godfrey points to the law of remedies in support of his claims. Godfrey notes that we have repeatedly provided injunctive relief for constitutional violations without any enabling legislation. *See, e.g., Hensler v. City of Davenport,* 790 N.W.2d 569, 590 (Iowa 2010); *State v. Dudley,* 766 N.W.2d 606, 622 (Iowa 2009); *Varnum,* 763 N.W.2d at 906.

Godfrey argues there is no ordinary common law tort or statutory action that will provide him with complete relief. With respect to common law torts, Godfrey cites *Bivens,* where "the Court acknowledged that the common law could not adequately regulate the government's unique power to inflict injury upon individuals." James J. Park, *The Constitutional Tort Action as Individual Remedy*, 38 Harv. C.R.-C.L. L.

Rev. 393, 413 (2003); *see Bivens*, 403 U.S. at 394, 91 S. Ct. at 2003 (majority opinion). Godfrey also argues the statutory remedies under the Iowa Civil Rights Act are insufficient to vindicate his constitutional interests. The Iowa Civil Rights Act does not address discrimination based on partisan politics or his alleged deprivations of property or liberty as a result of partisan politics. Thus, Godfrey argues, the statutory remedy is insufficient to afford him complete relief.

Further, Godfrey notes that the remedies under the Iowa Civil Rights Act do not provide the same measure of deterrence as a *Bivens* action. Godfrey cites *FDIC v. Meyer*, 510 U.S. 471, 485, 114 S. Ct. 996, 1005 (1994), and *Carlson v. Green*, 446 U.S. 14, 21–22, 100 S. Ct. 1468, 1473 (1980), for the proposition that *Bivens* remedies offer more effective deterrence than most statutory remedies because of the availability of punitive damages and the prospect of individual liability.

Having established the general framework of analysis, Godfrey then turns to Iowa caselaw. Godfrey argues that our prior caselaw does not impede, and in fact supports, recognizing a private cause of action. Godfrey cites several of our early twentieth century cases which he maintains stand for the proposition that damages are available for violations of the Iowa Constitution. *See, e.g.*, *Girard v. Anderson*, 219 Iowa 142, 148, 257 N.W. 400, 403 (1934); *McClurg v. Brenton*, 123 Iowa 368, 371, 98 N.W. 881, 882 (1904). Godfrey further claims that *Conklin*, the recent court of appeals case, is factually and procedurally distinguishable, was incorrectly decided, and moreover, is not binding precedent. *See* 2015 WL 1332003, at *1.

2. *Defendants.* The defendants argue that the due process and equal protection clauses of the Iowa Constitution are not self-executing. They claim the plain language of article XII, section 1 requires that "[t]he

general assembly shall pass all laws necessary to carry this constitution into effect." Iowa Const. art. XII, § 1. While Godfrey focuses on the narrow term "necessary," the defendants draw our attention to the use of "shall" in the constitutional provision.

The defendants argue that if the drafters of the Iowa Constitution had intended the Iowa Constitution to be self-executing, they would have said so. The defendants argue that if the Iowa Constitution was, in fact, self-executing, the language in article XII, section 1 would be unnecessary. Further, the defendants point to article I, section 18, which provides that "[p]rivate property shall not be taken for public use without just compensation first being made." Iowa Const. art. I, § 18. This provision, defendants argue, is the only provision in the Bill of Rights which explicitly authorizes an award of money damages. The defendants note that while a number of states have enacted an analogue of 42 U.S.C. § 1983 for state constitutional claims, Iowa has not enacted such a statute.

The defendants rely on a trilogy of our prior cases to support their argument that the due process and equal protection clauses of the Iowa Constitution are not self-executing. The first case is *State ex rel. Halbach v. Claussen*, 216 Iowa 1079, 250 N.W. 195 (1933). In *Claussen*, this court considered whether the provisions of article IV, section 10 of the Iowa Constitution dealing with holding elections to fill vacancies for office were self-executing. *Id.* at 1091, 250 N.W. at 200. The *Claussen* court held that they were not. *Id.*

The second Iowa case cited by the defendants in support of their argument that the due process and equal protection clauses of the Iowa Constitution are not self-executing is *Pierce v. Green*, 229 Iowa 22, 294 N.W. 237 (1940). In *Pierce*, the plaintiff sought a writ of mandamus

ordering the state tax commission to convene and directing them to exercise their honest discretion in assessing all property. *Id.* at 27, 294 N.W. at 242. We reversed a dismissal of the plaintiff's action. *Id.* at 55, 294 N.W. at 256. In passing, the *Pierce* court stated that provisions of the Iowa Constitution, including the equal protection clause, "are not self-executing, but require legislative action to make them effective." *Id.* at 29, 294 N.W. at 243.

The third Iowa case cited by the defendants is *Van Baale v. City of Des Moines*, 550 N.W.2d 153 (Iowa 1996). In *Van Baale*, we considered claims brought by a discharged Des Moines police officer who unsuccessfully protested his dismissal through the administrative process and through judicial review before finally bringing a separate equal protection action. *Id.* at 154. We held that Van Baale had failed to assert a viable equal protection claim because he did not specify any group of persons who were treated differently as a class. *Id.* at 157.

In addition to this substantive holding, however, the *Van Baale* court added additional language. *Id.* The *Van Baale* court stated, "Although the equal protection clause creates a constitutionally protected right, that right is not self-enforcing. Equal protection rights may be enforced only if the Congress or a legislature provides a means of redress through appropriate legislation." *Id.* (citation omitted).

Defendants concede that a number of other state supreme courts have recognized direct damage actions under their state constitutions without specific legislation. However, defendants maintain that some of these state constitutions have different enabling clauses and other constitutional provisions. The defendants claim that these other constitutional provisions provide a stronger basis for damages action than the provisions of the Iowa Constitution.

The defendants recognize that in *Bivens*, the United States Supreme Court recognized a direct cause of action for a search and seizure violation of the United States Constitution. 403 U.S. at 397, 91 S. Ct. at 2005. The defendants argue that in more recent cases, the Court has retreated from its *Bivens* holding. *See, e.g., Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74, 122 S. Ct. 515, 523 (2001); *Chappell v. Wallace*, 462 U.S. 296, 305, 103 S. Ct. 2362, 2368 (1983).

The defendants assert that creating a direct cause of action for violations of the due process and equal protections clauses would violate separation of powers. Given the express language of the enabling clause granting the power to enact laws in order to effectuate the Iowa Constitution to the legislature, the courts cannot usurp the power of the legislature by declaring the due process and equal protection provisions of the Iowa Constitution to be self-executing. Defendants cite cases from other states reprising such separation of powers concerns. *See, e.g., Lewis v. State*, 629 N.W.2d 868, 871 (Mich. 2001); *Bandoni v. State*, 715 A.2d 580, 595 (R.I. 1998).

Finally, the defendants argue that the early twentieth century cases such as *McClurg*, 123 Iowa 368, 98 N.W. 881, and *Girard*, 219 Iowa 142, 257 N.W. 400, that Godfrey cites as supporting a direct cause of action are inapposite. These cases, defendants stress, are factually and legally distinguishable from Godfrey's case.

**B. Approach of United States Supreme Court to Question of Whether Provisions of the United States Constitution Are Self-Executing for Purposes of Actions for Money Damages.** This case deals with the proper interpretation of provisions of the Iowa Constitution. Although the precedents of the United States Supreme Court under the United States Constitution are not binding upon us in

our interpretation of the Iowa Constitution, we may nonetheless give them respectful consideration in our independent analysis. *State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010). We may consider the persuasiveness of federal precedent, but we are by no means bound by it. *State v. Short*, 851 N.W.2d 474, 490 (Iowa 2014); *State v. Baldon*, 829 N.W.2d 785, 790 (Iowa 2013); *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011).

The key modern United States Supreme Court precedent on the question of whether provisions of the United States Constitution are self-executing without legislative implementation is *Bivens*, 403 U.S. at 397, 91 S. Ct. at 2005. Bivens claimed that Federal Bureau of Narcotics agents entered his apartment without a warrant, arrested him, threatened to arrest his family, searched the apartment "from stem to stern," and took him to a federal courthouse where he was interrogated, booked, and strip searched. *Id.* at 389, 91 S. Ct. at 2001. Bivens sought damages for the humiliation and mental suffering he sustained from the agents' unlawful conduct based on alleged violation of the search and seizure provisions of the Fourth Amendment. *Id.* at 389–90, 91 S. Ct. at 2001. The agents moved to dismiss, arguing that Bivens's only remedies existed under state law in tort for violation of the right to privacy. *Id.* at 390, 91 S. Ct. at 2001–02. The agents argued that the Fourth Amendment only applied to limit the ability of the agents to defend their actions as being a valid exercise of federal power—if the agents' actions offended the Fourth Amendment, then they would be treated under state law as private individuals. *Id.* at 390–91, 91 S. Ct. at 2002.

The *Bivens* Court rejected the agents' argument, maintaining that when federal agents violate the Fourth Amendment their power as federal agents "does not disappear like a magic gift when it is wrongfully used."

*Id.* at 391–92, 91 S. Ct. at 2002. The Fourth Amendment protects individuals from wrongful conduct whether or not state law would find fault with the same conduct if committed by a private individual. *Id.* at 392–94, 91 S. Ct. at 2002–03.

The *Bivens* Court further explained that the privacy rights protected by state law and the Fourth Amendment may be "inconsistent or even hostile" with one another. *Id.* at 394, 91 S. Ct. at 2003. For example, if a private individual is granted entry to one's home, then the private individual is not liable for trespass—had the homeowner not wished to grant the private individual entry, the homeowner could lawfully bar entry or call the police. *Id.* at 394–95, 91 S. Ct. at 2003–04. If, however, the individual seeking to enter is acting under federal authority, it is futile to resist entry—the police would not assist the homeowner in repelling an unwelcome federal agent. *See id.* at 395, 91 S. Ct. at 2004. State law may not act to expand or circumscribe federal power; only federal law may so act. *Id.* The Fourth Amendment, therefore, must exist as a claim independent from any other state law claims. *Id.*

The *Bivens* Court supported the imposition of damages for violations of the Fourth Amendment by explaining that an action for damages has historically been the ordinary remedy for invasions of privacy interests. *Id.* The Court explained it is "well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Id.* at 396, 91 S. Ct. at 2004 (quoting *Bell v. Hood*, 327 U.S. 678, 684, 66 S. Ct. 773, 777 (1946)). In *Bivens*, the Court found no special factors which would urge hesitation to create a cause of action absent legislative action, citing

special factors like "federal fiscal policy" and imposing liability on a congressional employee acting in excess of authority lawfully delegated by Congress. *Id.* at 396–97, 91 S. Ct. at 2004–05. Finally, the Court explained, actions for damages have not been expressly forbidden by Congress in favor of another remedy which Congress views as equally effective. *Id.* at 397, 91 S. Ct. at 2005.

Justice Harlan concurred in the judgment, explaining that it was uncontroversial that Bivens had a right to be free from unlawful searches and seizures, but that the real question was whether the Constitution placed the ability to create an action for damages for constitutional violations exclusively in the hands of Congress. *Id.* at 399–400, 91 S. Ct. at 2006 (Harlan, J., concurring). Justice Harlan reasoned that the Supreme Court possessed the authority to create an action for damages because (1) the decision to grant damages does not involve "policy considerations not susceptible of judicial discernment"; (2) the Court has always had the power to grant equitable relief for invasions of constitutional interests without explicit congressional authorization and

> if a general grant of jurisdiction to the federal courts by Congress is thought adequate to empower a federal court to grant equitable relief . . . then it seems . . . that the same statute is sufficient to empower a federal court to grant a traditional remedy at law;

(3) state remedies for violations of common law rights are limited when applied to federal officials acting under color of law; (4) injuries of the kind Bivens suffered cannot be remedied by an injunction—they have already occurred; and (5) recognizing a cause of action for damages would likely not result in a great expenditure of judicial resources hearing such claims because (a) these claims would rarely be successful due to jury hostility, and (b) Fourth Amendment interests rank highly on

a "scale of social values" compared to other interests which are already protected by the availability of an action for damages. *Id.* at 402–11, 91 S. Ct. at 2008–12.

A few years after *Bivens,* the Supreme Court held that a woman who alleged she had been discriminated against on the basis of sex by a congressman had a cause of action for damages under the Fifth Amendment's Due Process Clause and its equal protection component. *Passman,* 442 U.S. at 248, 99 S. Ct. at 2279. After determining the plaintiff had a protected right to be free of sexual discrimination under the Fifth Amendment, the *Passman* Court next asked whether there were any special factors counseling hesitation such that a *Bivens* remedy for damages should not be granted without Congressional authorization. *Id.* at 245, 99 S. Ct. at 2277.

To answer whether there were "special factors" counseling hesitation, the *Passman* Court reviewed considerations addressed by the *Bivens* majority and Justice Harlan's concurrence in *Bivens.* *Id.* at 245–48, 99 S. Ct. at 2277–79. First, the Court found damages are an appropriate remedy for due process and equal protection violations because, as described in *Bivens,* damages are the ordinary remedy for invasion of "personal interests in liberty." *Id.* at 245, 99 S. Ct. at 2277 (quoting *Bivens,* 403 U.S. at 395, 91 S. Ct. at 2004 (majority opinion)). Additionally, the Court reasoned that courts will not encounter difficulty in measuring damages due to the experience that courts have in evaluating claims for back pay as a result of sex discrimination. *Id.* Moreover, according to the Court, equitable relief would not make the plaintiff whole. *Id.* In a statement that has become epigrammatic, the Court noted "it is damages or nothing." *Id.* (quoting *Bivens,* 403 U.S. at 410, 91 S. Ct. at 2012 (Harlan, J., concurring)).

Second, the *Passman* Court noted that a suit against a congressman does raise special concerns counseling hesitation. *Id.* at 246, 99 S. Ct. at 2277. These special concerns, however, should be addressed by reference to the Speech or Debate Clause, which provides principles for determining when a congressman is not acting as a congressman but as an ordinary employer. *Id.*; *see* U.S. Const. art. I, § 6, cl. 1. The Court further explained that congressmen are not above the law. *Passman*, 442 U.S. at 246, 99 S. Ct. at 2277. Therefore, the Court held, if the congressman's actions were not shielded by the Speech or Debate Clause, then the plaintiff's suit could go forward. *Id.*

Third, the *Passman* Court found that Congress had not explicitly declared that a suit for damages *is not* available in a federal employment discrimination case. *Id.* at 246–47, 99 S. Ct. at 2278. The Court found no evidence that Title VII of the 1964 Civil Rights Act was intended to foreclose alternative remedies. *Id.* at 247, 99 S. Ct. at 2278.

Fourth, and finally, the *Passman* Court did not perceive the potential for a "deluge" of federal claims if a *Bivens* claim were allowed. *Id.* at 248, 99 S. Ct. at 2278. For one thing, 42 U.S.C. § 1983 already existed to provide recovery for plaintiffs when the injuries occurred under color of state law. *Id.* The Court reasoned that not every tort committed by a federal official would represent a constitutional violation—the necessity of first demonstrating a violation of constitutional rights is a significant hurdle that few plaintiffs could successfully vault. *Id.*

The *Passman* Court concluded by noting that if Congress created an equally effective alternative remedy, the need for a direct constitutional action for damages "might be obviated." *Id.* The Court, however, seemed to stress the "might" by quoting Justice Harlan's *Bivens*'s concurrence,

> Judicial resources, I am well aware, are increasingly scarce these days. Nonetheless, when we automatically close the courthouse door solely on this basis, we implicitly express a value judgment on the comparative importance of classes of legally protected interests. And current limitations upon the effective functioning of the courts arising from budgetary inadequacies should not be permitted to stand in the way of the recognition of otherwise sound constitutional principles.

*Id.* at 248, 99 S. Ct. at 2278–79 (quoting *Bivens*, 403 U.S. at 411, 91 S. Ct. at 2012).

In addition to *Bivens* and *Passman*, the Supreme Court heard a third case in which the issue of the validity of a constitutional action for damages was squarely before the Court. In *Carlson*, the Supreme Court recognized a *Bivens* action in the case of a mother who sued on behalf of her son who, she alleged, suffered injuries and died in federal prison in violation of his due process, equal protection, and Eighth Amendment rights. 446 U.S. at 16, 100 S. Ct. at 1470.

The *Carlson* Court explained that when a plaintiff shows they were injured by a federal agent's constitutional violations, the plaintiff has a right to recover damages *except* when (1) there are "special factors counseling hesitation in the absence of [an] affirmative action by Congress," or (2) Congress has already "provided an alternate remedy which it explicitly declared to be a *substitute* for a recovery directly under the Constitution and viewed as equally effective." *Id.* at 18–19, 100 S. Ct. at 1471. The Court found no special factors counseling hesitation because federal prison officials "do not enjoy such independent status in our constitutional scheme as to suggest that judicially created remedies against them might be inappropriate." *Id.* at 19, 100 S. Ct. at 1472.

The *Carlson* Court next looked at the Federal Tort Claims Act to see if the Act was intended to be a substitute for recovery under the Constitution. *Id.* The Court held that it was not so intended, finding

nothing in its legislative history to show either intent to preempt a *Bivens* remedy or to create an equally effective remedy for a constitutional violation. *Id.* Additionally, the Court found that a *Bivens* remedy is more effective than a remedy under the Federal Tort Claims Act because a *Bivens* remedy is recoverable against individuals and thus serves a deterrent purpose because individual federal officers face personal financial liability. *Id.* at 20–21, 100 S. Ct. at 1472–73. Further, the Court reasoned that availability of punitive damages for a *Bivens* action means the constitutional action is more effective than the statutory action, in which punitive damages are prohibited. *Id.* at 22, 100 S. Ct. at 1473. The Court concluded that plainly the Federal Tort Claims Act "is not a sufficient protector of the citizens' constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated respondent exclusively to the FTCA remedy." *Id.* at 23, 100 S. Ct. at 1474.

The parties have provided laundry lists of United States Supreme Court cases which they claim either support the continuing viability of *Bivens* claims or show federal hostility to such claims. The defendants direct our attention to the following cases which they claim show the Supreme Court no longer favors such claims. *See Minneci v. Pollard*, 565 U.S. 118, 131, 132 S. Ct. 617, 626 (2012) (declining to recognize a *Bivens* action against individual private employers running a federal prison); *Wilkie v. Robbins*, 551 U.S. 537, 549–62, 127 S. Ct. 2588, 2597–605 (2007) (denying a *Bivens* Fourth and Fifth Amendment claim based on Bureau of Land Management extortion because plaintiff had ample other remedies and because claims in the case were ill-suited for judicially crafted relief); *Corr. Servs. Corp.*, 534 U.S. at 66, 74, 122 S. Ct. at 519, 523 (describing the holding of *Bivens* as "limited" and declining to

allow a damages action against private corporations acting under color of federal law for a constitutional deprivation); *Chappell*, 462 U.S. at 300, 103 S. Ct. at 2365–66 (finding special factors counseling hesitation due to the unique disciplinary structure of the military establishment in a military race discrimination case).

In response, Godfrey cites a collection of cases that he claims cite *Bivens* and support its continued vitality. *See, e.g., Groh v. Ramirez*, 540 U.S. 551, 555, 124 S. Ct. 1284, 1288–89 (2004) (involving a *Bivens* action for violation of the Fourth Amendment); *Farmer v. Brennan*, 511 U.S. 825, 830, 114 S. Ct. 1970, 1975 (1994) (concerning a *Bivens* action for violation of the Eighth Amendment); *Mitchell v. Forsyth*, 472 U.S. 511, 515, 105 S. Ct. 2806, 2809 (1985) (presenting a *Bivens* action for violation of the Fourth Amendment from wiretapping); *Harlow v. Fitzgerald*, 457 U.S. 800, 805, 102 S. Ct. 2727, 2731 (1982) (underlying suit involved *Bivens* claims); *Butz v. Economou*, 438 U.S. 478, 482–83, 98 S. Ct. 2894, 2898 (1978) (underlying suit involved *Bivens* claims).

It is no great surprise that, in the years since *Bivens*, the Court has been cautious about expanding its *Bivens* holding, and in some cases has retreated from the scope of its holding. *See* Vicki C. Jackson, *Suing the Federal Government: Sovereignty, Immunity, and Judicial Independence*, 35 Geo. Wash. Int'l L. Rev. 521, 566–67 (2003); *see also Ziglar v. Abbasi*, 582 U.S. ___, ___, 137 S. Ct. 1843, 1857, (2017) ("[T]he Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity."). Many cases appearing to grant potentially expansive rights from the Warren and Burger Courts have been limited or contained. *See* Nelson Lund, *The Rehnquist Court's Pragmatic Approach to Civil Rights*, 99 Nw. U. L. Rev. 249, 288 (2004); *see generally* Ronald Kahn, *The Supreme Court as a (Counter) Majoritarian Institution:*

*Misperceptions of the Warren, Burger, and Rehnquist Courts*, 1994 Det. C.L. Rev. 1, 5–6 (1994). But because we do not march in lockstep with federal law, the continuing viability of federal *Bivens* claims would be important only if later cases cast doubt on the reasoning of the original opinion.

Further, as noted by the New York Court of Appeals, the "concerns of federalism underlie much of the Supreme Court's reluctance to expand relief available . . . and thereby unduly interfere with States' rights." *Brown v. State*, 674 N.E.2d 1129, 1143 (N.Y. 1996) (discussing actions under § 1983); *see also* Jennifer Friesen, *Recovering Damages for State Bills of Rights Claims*, 63 Tex. L. Rev. 1269, 1275 (1985) (stressing state judges should not be affected by need of federal courts to make nationally uniform rules); Gary S. Gilden, *Redressing Deprivations of Rights Secured by State Constitutions Outside the Shadow of the Supreme Court's Constitutional Remedies Jurisprudence*, 115 Penn. St. L. Rev. 877, 882 (2011) ("[I]t is well settled that the Supreme Court is constrained by federalism when asked to recognize a right under the United States Constitution. . . . However, concerns over federal incursion on the prerogative of the states do not exist when a state court enforces the guarantees of the state's own constitution."). We have no such federalism concerns to dilute our approach to judicially enforceable individual rights provisions of the Iowa Constitution.

In any event, a review of the caselaw since *Bivens* does not show a retreat from *Bivens* reasoning as applied to situations like Godfrey's. Rather, the cases show an unwillingness to expand *Bivens* claims beyond the Fourth Amendment circumstances in *Bivens* itself, the due process/equal protection/cruel and unusual punishment federal prison context in *Carlson,* and the due process/equal protection employment

discrimination context in *Passman*. Had cases since *Passman* and *Carlson* weakened these cases' holdings or cast doubt on their reasoning, this information would be important in our determination of their persuasive value. As it is, *Bivens*, *Carlson*, and *Passman* remain to persuade us or fail to persuade on their own terms.

A final federal case of note comes from the United States District Court for the Northern District of Iowa which held a *Bivens* claim would be recognized under Iowa law. *McCabe v. Macaulay*, 551 F. Supp. 2d 771, 785 (N.D. Iowa 2007). In *McCabe*, the plaintiffs brought *Bivens* actions against the defendants, who were state police officers, under both the Federal and State Constitutions, arguing that we would recognize a *Bivens* action under the Iowa Constitution. *Id.* at 784. The court discussed our holding in *Cunha v. City of Algona*, 334 N.W.2d 591 (Iowa 1983), in which we rejected a *Bivens* action against a municipal government. *McCabe*, 551 F. Supp. 2d at 784. The federal district court explained that *McCabe* was distinguishable from *Cunha*, stating,

> At most, *Cunha* rejects a direct cause of action under the due process clause of the Iowa Constitution for monetary damages against a local governmental entity for reasons expressed in *Monell* [*v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018 (1978), a United States Supreme Court case extending § 1983 liability to local governments]. It does not address whether there is an Iowa analogue to *Bivens* under the common law when, as here, Iowa government officials are alleged to have violated the Iowa Constitution and the Iowa General Assembly has not specifically provided a statutory remedy for such violations.

*Id.* at 785. The federal district court predicted that we would be persuaded by *Bivens* and the state courts that have accepted *Bivens* claims under their state constitutions and recognize a *Bivens* claim under the Iowa Constitution. *Id.*; *see Dorwart v. Caraway*, 58 P.3d 128, 133–36 (Mont. 2002). Another federal district court agreed with *McCabe*

that we would recognize a *Bivens* action under the Iowa Constitution in *Peters v. Woodbury County*, 979 F. Supp. 2d 901, 971 (N.D. Iowa 2013).

**C. State Court Cases Considering Whether State Constitutional Provisions Are Self-Executing for Purposes of Actions for Money Damages.**

1. *Introduction.* Many other state appellate courts have had occasion to determine whether constitutional provisions in their state constitutions are self-executing for purposes of claims for money damages. *See Dorwart*, 58 P.3d at 133 & n.1 (listing states that had recognized an implied cause of action as of 2002); Sharon N. Humble, Annotation, *Implied Cause of Action for Damages for Violation of Provisions of State Constitutions*, 75 A.L.R.5th 619, 624–28 (2000). The states that have considered the issue are nearly equally divided in whether to recognize implied constitutional actions for damages[2] or whether to decline to recognize such actions.[3]

---

[2]*Gay Law Students Ass'n v. Pac. Tel. & Tel. Co.*, 595 P.2d 592, 602 (Cal. 1979) (recognizing action against a public utility for employment discrimination against homosexual employees and cites *Bivens* but does not expressly discuss availability of damages); *Laguna Publ'g Co. v. Golden Rain Found. of Laguna Hills*, 131 Cal. App. 3d 816, 854 (Ct. App. 1982) (recognizing action for damages under California Constitution); *Binette v. Sabo*, 710 A.2d 688, 693 (Conn. 1998) (recognizing state *Bivens* action for violations of search and seizure and personal liberty provisions); *Newell v. City of Elgin*, 340 N.E.2d 344, 349 (Ill. App. Ct. 1976) (recognizing state *Bivens* action for violation of search and seizure); *Moresi v. State*, 567 So. 2d 1081, 1093 (La. 1990) (recognizing state *Bivens* right for violations of search and seizure, but declining to award recovery because state officials possessed qualified immunity); *Widgeon*, 479 A.2d at 928 (recognizing *Bivens* actions for search and seizure, deprivation of liberty, life, and property); *Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 111 (Md. 2000) (recognizing a claim for damages under equal protection provision of state constitution); *Phillips v. Youth Dev. Program, Inc.*, 459 N.E.2d 453, 457 (Mass. 1983) (approving of *Bivens* actions generally, but dismissing the case because parties failed to argue state action); *Johnson v. Wayne County*, 540 N.W.2d 66, 69–70 (Mich. Ct. App. 1995) (recognizing due process right for damages under Michigan Constitution, but finding that factually plaintiff failed to allege discriminatory legislation); *Mayes v. Till*, 266 So. 2d 578, 580 (Miss. 1972) (summarily holding right of damages available for violation of search and seizure); *Stringer v. State*, 491 So. 2d 837, 849 (Miss. 1986) (Robertson, J., concurring) (acknowledging "theoretical" possibility of *Bivens* remedy for damages for violation of

search and seizure and citing *Mayes* and noting, however, this remedy is "as ineffective as a deterrent to police misconduct as it is inefficacious to protect and compensate the citizen"); *Dorwart*, 58 P.3d at 137 (recognizing implied action for damages for violation of right to privacy); *Jackson v. Consol. Rail Corp.*, 538 A.2d 1310, 1319 (N.J. Super. Ct. App. Div. 1988) (involving discrimination-based claim for damages under state constitution, among other claims); *Strauss v. State*, 330 A.2d 646, 649 (N.J. Super. Ct. Law Div. 1974) (recognizing *Bivens* claims under state constitution); *Brown*, 674 N.E.2d at 1144 (recognizing *Bivens*-type claim of racial discrimination under New York Constitution); *Corum v. Univ. of N.C.*, 413 S.E.2d 276, 290 (N.C. 1992) (recognizing *Bivens* action for violation of state free speech rights); *Jones v. Mem'l Hosp. Sys.*, 746 S.W.2d 891, 893–94 (Tex. App. 1988) (recognizing implied damages action for violation of Texas free speech right); *Old Tuckaway Assocs. Ltd. P'ship v. City of Greenfield*, 509 N.W.2d 323, 328 n.4 (Wis. Ct. App. 1993) (summarily recognizing *Bivens* actions under the Wisconsin Constitution).  *But see Dolan v. Bay Const. Grp. Co.*, No. 924947, 1994 WL 879528, at *3 & n.3 (Mass. Super. Ct. Nov. 9, 1994) (dismissing plaintiff's claim of handicap discrimination under state constitution because of an adequate statutory remedy); *Smith v. Dep't of Pub. Health*, 410 N.W.2d 749, 789–90 (Mich. 1987) (containing a full discussion of *Bivens*, but declining to find a viable *Bivens* action under 1908 Michigan Constitution after adoption of 1963 Michigan Constitution).

[3]*Dick Fischer Dev. No. 2, Inc. v. Dep't of Admin.*, 838 P.2d 263, 268 (Alaska 1992) (will only recognize a *Bivens* action in cases of "flagrant constitutional violations where little or no administrative remedies are available"); *Bd. of Cty. Comm'rs v. Sundheim*, 926 P.2d 545, 553 (Colo. 1996) (agreeing that policy considerations weigh heavily against judicial creation of a state *Bivens* action, but noting that it "may be appropriate to recognize an implied state constitutional cause of action when there is no other adequate remedy"); *Garcia v. Reyes*, 697 So. 2d 549, 550 (Fla. Dist. Ct. App. 1997) (per curiam) (no implied cause of action for damages under due process clause); *State Bd. of Educ. v. Drury*, 437 S.E.2d 290, 294 (Ga. 1993) (explaining court is not able to fashion a Georgia *Bivens* remedy because of sovereign immunity); *Figueroa v. State*, 604 P.2d 1198, 1205 (Haw. 1979) (refusing to recognize state *Bivens* action because state's sovereign immunity would render any *Bivens* claim ineffective); *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 537–38 (Ky. 2011) (declining to create a *Bivens* remedy because adequate alternative remedies exist, but noting that the holding was limited to the facts of this case); *Moody v. Hicks*, 956 S.W.2d 398, 402 (Mo. Ct. App. 1997) (rejecting claim that state constitutional provision barring unreasonable search and seizure is "self-executing" such that the court should imply an action for damages); *Rockhouse Mountain Prop. Owners Ass'n, Inc. v. Town of Conway*, 503 A.2d 1385, 1388 (N.H. 1986) (declining to recognize a *Bivens* remedy for the equal protection and due process claims in this case because damages not appropriate remedy for alleged constitutional violation in municipal decision in road construction); *Provens v. Stark Cty. Bd. of Mental Retardation & Developmental Disabilities*, 594 N.E.2d 959, 961 (Ohio 1992) (explaining that the court would imply a *Bivens*-type action if there were no alternate remedies available); *Hunter v. City of Eugene*, 787 P.2d 881, 884 (Or. 1990) (expressing reluctance to create any implied action for damages for violation of the state constitution, and particularly finding itself in a poor position to say what would be just compensation for violation of free speech rights); *Jones v. City of Philadelphia*, 890 A.2d 1188, 1215 (Pa. Commw. Ct. 2006) (not recognizing a *Bivens* claim under state constitution for violation of search and seizure and arguing, among other reasons, enormous financial burden and chilling effect on state officials); *Bandoni v. State*, 715

2. *Overview of state supreme court cases holding state constitutional provisions self-executing for purposes of money damages.* Among the better reasoned state supreme court decisions interpreting whether state constitutional provisions are self-executing for purposes of monetary damages are *Dorwart*, 58 P.3d 128; *Brown*, 674 N.E.2d 1129; and *Corum v. University of North Carolina*, 413 S.E.2d 276 (N.C. 1992).

In *Brown*, claimants brought a class action against the State of New York and other defendants for violating their rights to be free of unreasonable searches and seizures and to equal protection under the New York Bill of Rights. 674 N.E.2d at 1131. The claims arose out of an incident in which every nonwhite male encountered by police during a five-day "street sweep" was stopped, interrogated, and had their hands and forearms inspected by the police after a white woman reported that a black male robbed her at knife point. *Id.* at 1131–32. The claimants asked the Court of Appeals of New York to recognize the action, which the court called a "constitutional tort"—a cause of action for damages under the constitution. *Id.* at 1132–33 (citing *Bivens* as well as California, Maryland, Massachusetts, and Illinois cases recognizing state constitutional actions for damages).

---

A.2d 580, 587 (R.I. 1998) (declining to find that a victims' rights amendment to the state constitution was self-executing); *Lee v. Ladd*, 834 S.W.2d 323, 325 (Tenn. Ct. App. 1992) (summarily noting that Tennessee courts do not recognize state *Bivens* actions); *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 16 P.3d 533, 538 (Utah 2000) (limiting *Bott v. DeLand*, 922 P.2d 732, 739 (Utah 1996), which recognized a state *Bivens* action for cruel and unusual punishment violations); *Gray v. Rhoads*, 55 Va. Cir. 362, at *6–8 (Va. Cir. Ct. 2001) (predicting Virginia Supreme Court would decline to allow *Bivens* causes of action under state constitution and additionally finding adequate alternative remedies). *But see Smith v. Arthur C. Baue Funeral Home*, 370 S.W.2d 249, 254 (Mo. 1963) (pre-*Bivens* case summarily recognizing implied action for damages under state constitution provision ensuring the right to collectively bargain).

The *Brown* court began its analysis by recognizing that New York lacked a statute authorizing damages for violations of constitutional rights, unlike 42 U.S.C. § 1981. *Id.* at 1137. If any damages remedy existed, therefore, it must be implied. *Id.* The court recognized, however, that the state constitutional provision must be self-executing in order for a court to imply an action for damages. *Id.* Here, the court explained, the rights to equal protection and to be free of unreasonable searches and seizures were self-executing. *Id.*

Surveying the caselaw from other states, the *Brown* court determined that, when state courts imply actions for damages under their constitutions, they do so based on either (1) the reasoning in the Restatement (Second) section 874A, (2) by analogy to *Bivens*, (3) common law predecessors of the constitutional provision at issue, or (4) a combination of the previous three. *Id.* at 1138;[4] *see Widgeon*, 479 A.2d at 923–24 (justifying an implied action for damages under the Maryland Constitution almost entirely based on common law predecessors—

---

[4]As described above, the Restatement (Second) states that when a statute or constitutional provision protects a class of person by mandating or prohibiting certain conduct but does not provide for a civil remedy for a violation, a court may provide an injured member of the class with a right of action in tort if the court determines that the remedy furthers the purpose or is needed to ensure the effectiveness of the provision. Restatement (Second) § 874A & cmt. *a*, at 301; *see Brown*, 674 N.E.2d at 1138. The New York Court of Appeals also noted that many state courts rely on the reasoning of *Bivens*. *Brown*, 674 N.E.2d at 1138.

> The underlying rationale for the decision, in simplest terms, in that constitutional guarantees are worthy of protection on their own terms without being linked to some common-law or statutory tort, and that the courts have the obligation to enforce these rights by ensuring that each individual receives an adequate remedy for the violation of a constitutional duty.

*Id.* If the government fails to provide such a remedy, the courts must provide it themselves. *Id.* The court explained that both *Bivens* and the Restatement (Second) support one another and cited a number of state court decisions that have recognized these principles and applied them to their own constitutions. *Id.*

specifically a trespass action for violation of right to be free of unreasonable search and seizure guaranteed by the Magna Carta).

The *Brown* court also explained that the 1777 New York Constitution's provisions on equal protection and search and seizure are both based on older, common law antecedents—in the case of unreasonable search and seizure all the way back to the Magna Carta. *Id.* at 1138–39. The availability of these common law antecedents supports the position that the framers of the constitution anticipated that such actions would remain available under the constitution. *Id.* at 1139. Additionally, the recorded debates of the New York Constitutional Convention of 1938 and contemporaneous cases show the delegates assumed that victims of unconstitutional actions could sue for damages. *Id.*

The *Brown* court also held that implying a damages remedy is consistent with the purposes of the constitutional provisions and is "necessary and appropriate to ensure the full realization of the rights they state." *Id.* These provisions clearly define duties for government officers of the state. *Id.* at 1140. The abuses suffered by the claimants were exactly the sort of abuses that these constitutional provisions were designed to prevent. *Id.* Damages, the court stressed, "are a necessary deterrent for such misconduct. . . . [I]njunctive or declaratory relief [falls] short." *Id.* at 1141 (noting that because claimants were never charged with a crime, excluding any evidence resulting from their interrogations serves no deterrent purpose). Further, damages have been historically recognized as the appropriate remedy for invasions of personal liberties. *Id.*

Thus, the *Brown* court held that the plaintiffs had an implied right of damages under the search and seizures and equal protection clauses

of the New York Constitution. *Id.* A dissent argued the court lacked jurisdiction based on article VI, section 9 (stating the court has jurisdiction to hear such claims as the legislature may provide) of the New York Constitution and that sovereign immunity protected the state. *Id.* at 1145–48, 1152–54 (Bellacosa, J., dissenting). The dissent further criticized equating constitutional damages actions with common law torts. *Id.* at 1148–52; *see* Gail Donoghue & Jonathan I. Edelstein, *Life After* Brown*: The Future of State Constitutional Tort Actions in New York*, 42 N.Y.L. Sch. L. Rev. 447, 462–71 (1998) [hereinafter Donoghue] (describing the *Brown* opinion and the dissent).

In *Corum*, the Supreme Court of North Carolina held there was a direct cause of action under the North Carolina Constitution for damages for a violation of a plaintiff's free speech rights. 413 S.E.2d at 292. Corum was a tenured professor at Appalachian State University who also held the position of Dean of Learning Resources. *Id.* at 280. After a dispute with other university officials regarding the location of a library collection, Corum was removed from his position as Dean, allegedly in retaliation for Corum's vocal opposition to the move. *Id.* at 281–82. Corum sought damages for violating North Carolina's constitutional provisions protecting the right to free speech, equal protection, and "fundamental principles" of liberty. *Id.* at 280; *see also* Grant E. Buckner, *North Carolina's Declaration of Rights: Fertile Ground in a Federal Climate*, 36 N.C. Cent. L. Rev. 145, 157, 163 n.98 (2014) (describing North Carolina's protection of "fundamental principles" as a rich source of individual rights, including the right to earn a livelihood through lawful business).

The *Corum* court emphasized the primacy of the Declaration of Rights in article I of the North Carolina Constitution. 413 S.E.2d at 290.

According to the court, "The very purpose of the Declaration of Rights is to ensure that the violation of these rights is never permitted by anyone who might be invested under the Constitution with the powers of the State." *Id.* The court emphasized that "[w]e give our Constitution a liberal interpretation in favor of its citizens with respect to those provisions which were designated to safeguard the liberty and security of the citizens in regard to both person and property." *Id.*

A third illustrative case is *Dorwart*, 58 P.3d 128. In *Dorwart*, a judgment debtor sued a county sheriff and sheriff's deputies following seizure of property alleging due process and search and seizure violations under Federal and State Constitutions. *Id.* at 129–30. Law enforcement had writs of execution related to judgment indebtedness, but claimed nonexistent authority to search Dorwart's home. *Id.* at 130. The *Dorwart* court held that the plaintiff had causes of action under the Montana Constitution for violation of the due process and search and seizure provisions. *Id.* at 137.

The *Dorwart* court began its analysis by reviewing *Bivens, Passman,* and *Carlson. Id.* at 133–36. The court noted in *Bivens*, the United States Supreme Court had said "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty. . . . [F]ederal courts may use any available remedy to make good the wrong done." *Id.* at 135 (alterations in original) (quoting *Bivens*, 403 U.S. at 395–96, 91 S. Ct. at 2004 (majority opinion)). The *Dorwart* court noted that damage actions were endorsed by Restatement (Second) section 874A. *Id.* The court cited various cases standing for the proposition that damage actions for violations of individual rights were recognized under English common law. *Id.* at 135–36; *see Moresi v. State,* 567 So. 2d 1081, 1092 (La. 1990); *Widgeon,* 479 A.2d at 924. The

court rejected the argument that common law remedies were sufficient, noting that common law causes of action intended to regulate the relationships among and between individuals are not adequate to redress the type of damage caused by the invasion of constitutional rights. *Dorwart,* 58 P.3d at 137.

3. *Overview of state supreme court cases rejecting view that state constitutional provisions are self-executing.* Several cases illustrate the reasoning behind state supreme court cases which reject the notion that state constitutional provisions are self-executing for purposes of actions for money damages.

The Supreme Court of Oregon rejected a constitutionally based claim for money damages in *Hunter v. City of Eugene,* 787 P.2d 881, 884 (Or. 1990). In *Hunter,* striking teachers argued their state constitutional rights were violated by city employees. *Id.* at 882. The Oregon court rejected an action for money damages under the free speech provisions of the Oregon Constitution. *Id.* at 884. The court stated it was "very reluctant to impose any civil responsibility in the form of damages for violation of such a right, absent specific legislation or clear legislative intent." *Id.* at 883. The court declared that "Oregon's Bill of Rights provides no textual or historical basis for implying a right to damages for constitutional violations." *Id.* Lacking legislative guidance, the court observed "this court is in a poor position to say what should or should not be compensation for violation of a state constitutional right and what limitations on liability should be imposed." *Id.* at 884. The court noted that federal legislation such as 42 U.S.C. § 1983 and the Federal Civil Rights Act of 1964 provided at least some guidance for such claims on the federal level. *Id.* at 883.

The Texas Supreme Court rejected an action for monetary damages under the free speech and assembly clause of the Texas Constitution in *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 150 (Tex. 1995). The *Beaumont* court emphasized cases which were decided based on the presence or absence of alternative remedial schemes. *Id.* at 147–48. The court noted that no one had presented evidence suggesting that at the time the Texas Constitution was written, it was intended to provide an implied right of damages for the violation of constitutional rights. *Id.* at 148. The court further emphasized the language of the Texas Constitution, which suggested that acts in violation of constitutional provisions are void. *Id.* at 149.

The Colorado Supreme Court rejected a cause of action for money damages under the due process clause of the Colorado Constitution in a real estate zoning matter in *Board of County Commissioners v. Sundheim*, 926 P.2d 545, 553 (Colo. 1996) (en banc). The *Sundheim* court recognized that the United States Supreme Court found a cause of action for money damages in *Bivens*, but emphasized more recent Supreme Court cases that have declined to extend *Bivens* to other factual contexts. *Id.* at 551–52; *see Bush v. Lucas*, 462 U.S. 367, 390, 103 S. Ct. 2404, 2417 (1983); *Chappell*, 462 U.S. at 305, 103 S. Ct. at 2368. While the *Sundheim* court recognized there might be a state constitutional cause of action when there was no adequate remedy, it noted the legislature had established a framework for challenging a zoning ordinance. 926 P.2d at 553. As a result, the *Sundheim* court found it unnecessary to find a constitutionally based damage remedy in this case but did not necessarily rule it out under different circumstances. *Id.*; *see also Dick Fischer Dev. No. 2, Inc. v. Dep't of Admin.*, 838 P.2d 263, 268 (Alaska 1992) (denying damages for due process violation when other

administrative remedies available); *Rockhouse Mountain Prop. Owners Ass'n, Inc. v. Town of Conway*, 503 A.2d 1385, 1389 (N.H. 1986) (declining to find constitutional action for money damages under due process or equal protection provisions of state constitution when administrative procedures available); *Shields v. Gerhart*, 658 A.2d 924, 935–36 (Vt. 1995) (declining damages for free speech violation because of legislatively created remedies); *see also* Lance R. Chism, Bivens-*Type Actions Under State Constitutions—Will Tennessee Give You a Remedy?*, 30 U. Mem. L. Rev. 409, 425 (2000) (noting states not finding an action for damages usually rely on alternative legislative remedy).

**D. Iowa Caselaw on Self-Executing Constitutional Claims.** The Iowa Supreme Court has a long and storied tradition of deciding cutting-edge cases well in advance of later decisions of the United States Supreme Court and other courts. We were in advance of the United States Supreme Court in *In re Ralph*, Morris 1, 6–7 (Iowa 1839), which rejected the approach later adopted by the United States Supreme Court in the infamous *Dred Scott* case. *See Dred Scott v. Sanford*, 60 U.S. 393, 454 (1857), *superseded by constitutional amendment*, U.S. Const. amend. XIV. We advanced the cause of civil rights by refusing to countenance segregation in education or public accommodations in *Clark* and *Coger* many decades before the United States Supreme Court decided *Brown v. Board of Education*, 347 U.S. 483, 495, 74 S. Ct. 686, 692 (1954). *See Coger v. Nw. Union Packet Co.*, 37 Iowa 145, 158 (1873); *Clark v. Bd. of Dirs.*, 24 Iowa 266, 277 (1868). We invalidated sodomy statutes early on in *State v. Pilcher*, 242 N.W.2d 348, 359 (Iowa 1976), and we recognized gay marriage rights in *Varnum*, 763 N.W.2d 862, 907, well in advance of the United States Supreme Court decision in *Obergefell v. Hodges*, 576 U.S. ___, ___, 135 S. Ct. 2584, 2604–05 (2015).

Similarly, fifty years before the United States Supreme Court decided *Bivens*, we decided several cases finding that the search and seizure clause of the Iowa Constitution supported an action for damages without implementing legislation. In *McClurg*, we reversed a directed verdict in favor of the defendants on a claim for damages against an officer who conducted a search without a warrant. 123 Iowa at 371, 98 N.W. at 882. We emphasized,

> The right of the citizen to occupy and enjoy his home, however mean or humble, free from arbitrary invasion and search, has for centuries been protected with the most solicitous care by every court in the English-speaking world, from Magna [Carta] down to the present, and is embodied in every bill of rights defining the limits of governmental power in our own republic.

*Id.* The right to be free from arbitrary search and seizure, was also embraced in statute and in the common law. *Id.* at 372, 98 N.W. at 882.

We returned to the question of damages in the search and seizure context in *Krehbiel v. Henkle*, 142 Iowa 677, 121 N.W. 378 (1909). In *Krehbiel*, the court noted that the right of citizens to be secure in person and property against wrongful seizures and searches is "zealously safeguarded and has express recognition in our State Constitution." *Id.* at 679–80, 121 N.W. at 379–80; *see* Iowa Const. art. I, § 8. The court declared it was "thoroughly well settled" that "a violation of this right without reasonable ground therefor gives the injured party a right of action." *Krehbiel*, 142 Iowa at 680, 121 N.W. at 380. In an appeal of the case, the court affirmed an award of punitive damages in an unspecified amount, noting that such damages were available for conduct that was "wanton and reckless, and in disregard of the plaintiff's rights." *Krehbiel v. Henkle*, 152 Iowa 604, 606, 129 N.W. 945, 945 (1911).

We considered the thoroughly well settled principle that violation of article I, section 8 gives rise to a cause of action in *State v. Tonn*, 195 Iowa 94, 191 N.W. 530 (1923), *abrogated by State v. Cline*, 617 N.W.2d 277, 291 (Iowa 2000). In *Tonn*, we rejected the exclusionary rule for search and seizure violations. *Id.* at 107, 191 N.W. at 536. The court in *Tonn*, however, emphasized the rejection "would not detract one iota from the full protection vouchsafed to the citizen by the constitutional provisions," observing, "[a] trespassing officer is liable for all wrong done in an illegal search or seizure." *Id.* at 106, 191 N.W. at 535. We further said the right against unreasonable searches and seizures was "a sacred right, and one which the courts will rigidly enforce." *Id.*

*McClurg* and *Krehbiel* were cited with approval in *Girard*, 219 Iowa at 148, 257 N.W. at 403. In *Girard*, consistent with the thoroughly well settled principle of our prior cases, we straightforwardly declared, "[a] violation of the state and federal constitutional provisions against the unreasonable invasion of a person's home gives the injured party a right of action for damages for unlawful breaking and entering." *Id.* Thus, a damages action for constitutional violations of search and seizure under the Iowa Constitution was thoroughly well settled in Iowa law decades before the United States Supreme Court embraced the same concept in *Bivens. See Krehbiel*, 142 Iowa at 680, 121 N.W. at 380.

While we held that search and seizure provisions of the Iowa Constitution are self-executing in *Girard*, we came to a different conclusion on article IV, section 10 of the Iowa Constitution regarding the holding of elections to fill vacancies for office. In *Claussen*, we came to the commonsense conclusion that this provision was not self-executing. 216 Iowa at 1091, 250 N.W. at 200. The constitutional provision itself failed to provide the necessarily detailed framework for

implementing elections, referring to situations which occurred when "no mode is provided by the Constitution and laws for filling such vacancy" in offices. *Id.* at 1083, 250 N.W. at 197 (quoting Iowa Const. art. IV, § 10). If the vacancy were to be filled by "election of the people," the General Assembly had to provide the machinery for the election. *Id.* at 1090, 250 N.W. at 200. The Iowa Supreme Court thus did not have the legislative power to create the framework for a special election in the absence of actions by other branches of government. *Id.* at 1091, 250 N.W. at 200.

In *Pierce*, we considered a mandamus claim to require the Iowa tax commission to meet and exercise its power to fairly apportion taxes. 229 Iowa at 24–26, 294 N.W. at 241–42. In passing, we stated the uniformity provisions of the Iowa Constitution "are not self-executing, but require legislative action to make them effective." *Id.* at 29, 294 N.W. at 243. In context, however, the legislative action required referred to implementing legislation to establish the machinery necessary to levy taxes. *See id.* It did not relate to the question of whether a damage remedy could arise when the implementation of the uniformity provision by the state violated the uniformity clause. *See id.* Indeed, there is language in *Pierce* supportive of Godfrey's position—

> [W]here the law imposes a duty upon a state officer and his refusal or failure to perform it affects injuriously . . . the personal or property right of an individual, it cannot be that the court is without power or authority to administer an appropriate remedy.

*Id.* at 32, 294 N.W. at 245 (quoting *McKeown v. Brown,* 167 Iowa 489, 498, 149 N.W. 593, 596 (1914)).

The next case of interest is *Cunha,* 334 N.W.2d 591. In that case, a former prisoner sued Kossuth County for a due process violation. *Id.*

at 592–93. We held the plaintiff failed to state a claim on which relief could be granted. *Id.* at 595. *Cunha* was narrowly interpreted by the federal district court in *McCabe,* which regarded its holding as limited to the question of whether a money damages remedy was available against local government and did not have anything to do with potential individual liability. *McCabe,* 551 F. Supp. 2d at 785. In short, *Cunha* is similar to *Meyer,* where the Supreme Court declined to allow an action against a government agency on the ground there would no longer be a reason to bring actions against individual officers. *See Meyer,* 510 U.S. at 485, 114 S. Ct. at 1005.

Finally, in *Van Baale,* a terminated police officer sought to avoid the limitations on remedies provided by a civil service commission ruling by bringing an action for money damages alleging a violation of equal protection. 550 N.W.2d at 155. The plaintiff, however, failed to identify any group of persons who were treated differently by the defendants, and as a result, the equal protection claim failed as a matter of law. *Id.* at 157. We said, in dicta, that the equal protection clause was not self-enforcing, citing *Katzenbach v. Morgan,* 384 U.S. 641, 648, 86 S. Ct. 1717, 1722 (1966). *Van Baale,* 550 N.W.2d at 157. *Katzenbach,* however, involved a very different question than whether any provisions of a constitution were self-enforcing. Instead, the question in *Katzenbach* was whether congressional power to implement the Equal Protection Clause of the Fourteenth Amendment was coextensive with judicial interpretation of the Clause or whether Congress possessed broader power to extend remedies and protections than the Supreme Court might employ in the absence of congressional legislation. *See* 384 U.S. at 649, 86 S. Ct. at 1722. The question in *Katzenbach* had nothing to do with stand-alone judicial power under the Fourteenth Amendment.

*See id.* And, the Supreme Court ultimately addressed the very issue in *Passman,* a case not cited by *Van Baale,* and came to the opposite conclusion. *See Passman,* 442 U.S. at 248–49, 99 S. Ct. at 2279.

**E. Discussion.**

1. *Iowa constitutional tradition.* We begin our discussion by emphasizing the importance of the Bill of Rights in our scheme of government. Unlike the federal constitutional framers who did not originally include a bill of rights and ultimately tacked them on as amendments to the United States Constitution, the framers of the Iowa Constitution put the Bill of Rights in the very first article. *See* Iowa Const. art. I. Further, the record of the 1857 Iowa Constitutional Convention reflects a desire of its members

> to put upon record every guarantee that could be legitimately placed [in the constitution] in order that Iowa not only might be the first State in the Union, unquestionably as she is in many respects, but that she might also have the best and most clearly defined Bill of Rights.

1 *The Debates of the Constitutional Convention of the State of Iowa* 100 (W. Blair Lord rep. 1867), http://www.statelibraryofiowa.org/ services/collections/law-library/iaconst. And, as noted by George Ells, Chair of the Committee on the Preamble and Bill of Rights, "the Bill of Rights is of more importance than all the other clauses in the Constitution put together, because it is the foundation and written security upon which the people rest their rights." *Id.* at 103; *see Short,* 851 N.W.2d at 482.

While citation to a state motto may seem like parochial legal boosterism, the early Iowa legislature adopted a distinctly libertarian state motto: "Our liberties we prize, and our rights we will maintain." Iowa Code § 1A.1. Our founders did not cringe at the thought of

individual rights and liberties—they embraced them. "It would be incongruous to hold that our constitution is a drier source of private rights than the federal constitution." *Kelley Prop. Dev., Inc. v. Town of Lebanon*, 627 A.2d 909, 924 (Conn. 1993) (Borden, J., dissenting); *Corum*, 413 S.E.2d at 290 (emphasizing the "primacy of the Declaration [of Rights] in the minds of the framers" and that "[t]he very purpose of the Declaration of Rights is to ensure that the violation of these rights is never permitted by anyone who might be invested under the Constitution with the powers of the State"). In *Bivens*, Justice Harlan declared that the Bill of Rights was "intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities." 403 U.S. at 407, 91 S. Ct. at 2010 (Harlan, J., concurring). As further noted by Justice Harlan,

> I do not think that the fact that the interest is protected by the Constitution rather than statute or common law justifies the assertion that federal courts are powerless to grant damages in the absence of explicit congressional action authorizing the remedy.

*Id.* at 403, 91 S. Ct. at 2008.

The view was well expressed by Chief Justice Hughes of the New Jersey Supreme Court several decades ago—"Just as the Legislature cannot abridge constitutional rights by its enactments, it cannot curtail them through its silence, and the judicial obligation to protect the fundamental rights of individuals is as old as this country." *King v. S. Jersey Nat'l Bank*, 330 A.2d 1, 10 (N.J. 1974).

We agree with Justice Harlan and Chief Justice Hughes. If these individual rights in the very first article of the Iowa Constitution are to be meaningful, they must be effectively enforced. That is the point Justice Harlan made with such clarity in *Bivens*. According to Justice Harlan,

"the judiciary has a particular responsibility to assure the vindication of constitutional interests." *Bivens*, 403 U.S. at 407, 91 S. Ct. at 2010. It would be ironic indeed if the enforcement of individual rights and liberties in the Iowa Constitution, designed to ensure that basic rights and liberties were immune from majoritarian impulses, were dependent on legislative action for enforcement. It is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens. *See Corum*, 413 S.E.2d at 290.

It should be noted that the Iowa Constitution of 1857 tended to limit the power of the legislature while it protected the independence of the court. The Constitution of 1846 provided that the legislature appoint justices to the supreme court, but the Constitution of 1857 shifted that power away from the legislature and vested it in the people. *Compare* Iowa Const. art. V, §§ 3, 16 (1857), *with* Iowa Const. art. VI, § 3 (1846). Further, the Iowa Constitution of 1857 reflected a healthy skepticism of legislative power by structuring the legislative process by allowing only one subject in an act and prohibiting special laws, prohibiting the creation of corporations though special laws, prohibiting the state from becoming a stockholder in corporations or from paying corporate debts or liabilities, providing express limitations on banking, and by a requirement that school funds be held in a segregated account. *See* Iowa Const. art. III, §§ 29, 30 (1857); *id.* art. IV, §§ 1, 4–11; *id.* art. VII, § 1; *id.* art. VIII, §§ 1, 3; *id.* art. IX:2, § 3. This effort to control legislative action contrasts with the declarations of the founders regarding the robust character of the Bill of Rights. *See* David Schuman, *The Right to a Remedy*, 65 Temp. L. Rev. 1197, 1200 (1992) (noting popular distrust shifted from the courts to the legislatures and thus a "second wave" of state constitutions stripped "legislatures of many of their prerogatives

and vest[ed] increased power in the judiciary"); G. Alan Tarr, *Interpreting the Separation of Powers in State Constitutions*, 59 N.Y.U. Ann. Surv. Am. L. 329, 335 (2003) (describing the 19th century trend toward limiting legislative power). We cannot imagine the founders intended to allow government wrongdoers to set their own terms of accountability through legislative action or inaction. *See* Susan Bandes, *Reinventing* Bivens*: The Self-Executing Constitution*, 68 S. Cal. L. Rev. 289, 340–42 (1995).

As a rhetorical device, the defendants suggest that *Bivens* claims for Iowa constitutional violations amount to a "new cause of action." But we face an old problem, not a new problem. The old problem is whether courts have the power to provide an appropriate remedy for constitutional wrongs.

The notion that unconstitutional actions by government officials could lead to compensatory and exemplary damages was well established in English common law. In the highly publicized and notorious related cases of *Wilkes v. Wood*, (1763) 98 Eng. Rep. 489 (C.P.), and *Huckle v. Money*, (1763) 95 Eng. Rep. 768 (C.P.), the English courts considered cases arising out of unlawful searches and seizures conducted by Lord Halifax in an attempt to uncover the publishers of a caustic tract critical of the government in a newspaper. *See* William W. Greenhalgh & Mark J. Yost, *In Defense of the "Per Se" Rule: Justice Stewart's Struggle to Preserve the Fourth Amendment's Warrant Clause*, 31 Am. Crim. L. Rev. 1013, 1025 (1994). In these cases, the juries awarded substantial damages of £ 1000 and £ 300 pounds respectively. *Wilkes*, 98 Eng. Rep. at 499; *Huckle*, 95 Eng. Rep. at 768.

In *Wilkes*, the plaintiff's attorneys argued the actions of Halifax were an "outrage" and "wound" on the constitution. William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning 602–1791 447*

(2009).   The *Wilkes* court recognized the damages awarded by the jury exceeded the injury.   *Wilkes*, 98 Eng. Rep. at 498.   According to the court, however,

> a jury have it in their power to give damages for more than the injury received.   Damages are designed not only as a satisfaction to the injured person, but likewise as a punishment to the guilty, to deter from any such proceeding for the future, and as proof of the detestation of the jury to the action itself.

*Id.* at 498–99.

In *Huckle*, the amount of damages awarded was fifteen times the actual damages.  The Court of the King's Bench declared,

> [T]he personal injury done to [Huckle] was very small, so that if the jury had been confined by their oath to consider the mere personal injury only, perhaps [£] 20 damages would have been thought damages sufficient; but the small injury done to the plaintiff, or the inconsiderableness of his station and rank in life did not appear to the jury in that striking light in which the great point of law touching the liberty of the subject appeared to them at the trial . . . .   I think they have done right in giving exemplary damages.   To enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish Inquisition; a law under which no Englishman would wish to live an hour; it was a most daring public attack made upon the liberty of the subject.

*Huckle*, 95 Eng. Rep. at 768–69.

Another similar English case arising from Lord Halifax's indiscriminate searches was *Entick v. Carrington*, (1765) 95 Eng. Rep. 807 (C.P.), cited by the United States Supreme Court as a "monument of English freedom" and considered to be "the true and ultimate expression of constitutional law."  *Boyd v. United States*, 116 U.S. 616, 626, 6 S. Ct. 524, 530 (1886), *overruled in part on other grounds by Warden v. Hayden*, 387 U.S. 294, 302, 87 S. Ct. 1642, 1647–48 (1967).  The jury returned a special verdict for Entick in the amount of £ 300 if the search was

unlawful, a verdict which was affirmed by the court. *Entick*, 95 Eng. Rep. at 811, 818. *Entick* has been referred to as "perhaps the most important of all constitutional law cases to be found in the law reports of England; for it gave security under the law to all who may be injured by the torts of government servants." E.C.S. Wade, *Liability in Tort of the Central Government of the United Kingdom*, 29 N.Y.U. L. Rev. 1416, 1416–17 (1954). All told, in cases arising out of the illegal searches and seizures associated with Lord Halifax, a total of £ 5700 was paid, a substantial sum of money in those days. George C. Thomas III, *Stumbling Toward History: The Framers' Search and Seizure World*, 43 Texas Tech. L. Rev. 199, 213–14 (2010).

It is thus not surprising that Justice Harlan noted in *Bivens* that "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens*, 403 U.S. at 395, 91 S. Ct. at 2004; *see also Widgeon*, 479 A.2d at 924 (emphasizing application of English precedents). According to Justice Harlan, contemporary modes of thought at the time of the United States Constitutional Convention reflected "modes of jurisprudential thought which appeared to link 'rights' and 'remedies' in a 1:1 correlation." *Bivens,* 403 U.S. at 400 n.3, 91 S. Ct. at 2007 n.3; *see* John C. Jeffries, Jr., *Disaggregating Constitutional Torts*, 110 Yale L.J. 259, 281 (2000) ("Rights cannot sensibly be crafted apart from remedies . . . .").

Indeed, in one of our older precedents, we cited *Entick* using not only a law book citation but a citation from Howell's State Trials, a popular compendium of English state law cases. *See Sanders v. State*, 2 Iowa 230, 239 (1855). Thus, the territorial Supreme Court of Iowa was well aware of the practice of English courts to award damages for constitutional violations. Older cases from other states suggest that

state courts contemporaneous with the Iowa Constitutional Convention were well aware of search and seizure developments in England and assumed that the state constitutional founders were well aware, too. *See, e.g.*, *Lincoln v. Smith*, 27 Vt. 328, 346 (1855) (citing *Entick* and declaring the "controversy in England in relation to the validity of general warrants was well understood by the framers of our state and United States constitutions"); *Fisher v. McGirr*, 67 Mass. 1, 29 (1855) (stating issue of illegal searches and seizures "had been much discussed in England before the adoption of our constitution, and was probably well understood by its framers"). Not surprisingly, there are a number of early nineteenth century cases in which state courts imposed a damage remedy for constitutional violations, including punitive damages. *See, e.g.*, *Grumon v. Raymond*, 1 Conn. 40, 44 (1814) ("It would open a door for the gratification of the most malignant passions, if [the issuance of a general warrant] by a magistrate should s[c]reen him from damages."); *Simpson v. McCaffrey*, 13 Ohio 508, 522 (1844) (en banc) (allowing "smart money," which is "damages beyond compensation" for search and seizure violation); *Jeffries v. Ankeny*, 11 Ohio 372, 375 (1842) (permitting damages for violation of right to vote). The notion that a constitutional tort is somehow a creature of the twentieth century is thus incorrect. Jeremy M. Christiansen, *State Search and Seizure: The Original Meaning*, 38 U. Haw. L. Rev. 63, 82–84 (2016) (citing cases showing between 1814 and 1923 numerous states recognized constitutional torts).

Further, in the common law regime, remedies at law—or damages—were usually the first choice to remedy a protected right. It is equitable remedies, not damage remedies, which reflected the innovation in the common law. *See* Harold J. Berman, *The Origins of Historical Jurisprudence: Coke, Selden, Hale*, 103 Yale L.J. 1651, 1687–88 (1994);

Thomas O. Main, *Traditional Equity and Contemporary Procedure*, 78 Wash. L. Rev. 429, 464–67 (2003). Equitable remedies were generally thought to be available only after legal remedies were demonstrated as inadequate. *See* Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 545 (2016).

The defendants' ahistorical argument is thus upside down. The availability of damages at law is thus an ordinary remedy for violation of constitutional provisions, not some new-fangled innovation. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury*, 5 U.S. at 163. The real question is thus not whether a new cause of action is being created, but instead is whether the provision in question is self-executing, thereby putting a court in a position to award traditional damages.

2. *Impact of Iowa Constitution article XII, section 1.* Iowa Constitution article XII—the last article in the document—is entitled "Schedule." Section 1 provides, "This constitution shall be the supreme law of the state, and any law inconsistent therewith, shall be void. The general assembly shall pass all laws necessary to carry this constitution into effect." Iowa Const. art. XII, § 1.

Notably, section 1 uses the term "this" twice. "This" constitution (and not any earlier constitution) shall be the supreme law of the State. And the general assembly shall pass all laws necessary to carry "this" constitution into effect. The double use of the term "this" in section 1 suggests a focus on transition issues and not a fundamental reworking of the power of courts to fashion remedies.

The sections that followed in article XII generally, but not always, related to transition issues. Sections 2 through 14 of the original version

of article XII dealt with various proceedings, fines inuring to the state, bonds in force, elections of state officers, the meeting and makeup of the general assembly, the crafting of judicial districts, the submission of the Constitution to the people for approval, an election to strike the word "white" from various provisions of the Constitution. *See* Iowa Const. art. XII, §§ 2–14 (1857 original); Benjamin F. Shambaugh, *The Constitutions of Iowa* 279–80 (1934) [hereinafter Shambaugh]. At the very end, an unusual provision was tacked on, declaring that unless otherwise directed by law, "the County of Mills shall be part of the sixth Judicial District of the State." Iowa Const. art. XII, § 15; *see* Shambaugh, at 342. This latter provision has nothing to do with transition, and looks like a special concession made to someone who was at the right place at the right time.

The defendants contend that the sentence in section 1 that provides, "The general assembly shall pass all laws necessary to carry this constitution into effect" means that the provisions of the Iowa Bill of Rights in article I are not self-executing but require legislative action to be enforced. *See* Iowa Const. art. XII, § 1. Godfrey, on the other hand, contends that article XII, section 1 only requires the general assembly to pass laws "necessary" to carry "this" constitution in effect.

On this point, we agree with Godfrey. In context, we think the clear meaning of article XII, section 1 is to require the general assembly to put "this" new constitution into operation and to provide for the transition from government under the prior constitution to the new regime. The language in article I, section 1 was not meant to dramatically undermine effective judicial enforcement of the Iowa Bill of Rights by making remedies dependent upon legislative whim.

Further, a survey of the original 1857 Iowa Constitution demonstrates the framers knew how to use language that required the general assembly to act. There are several provisions of the constitution that expressly require the general assembly to take certain actions to implement it.[5]

Such requirements of action by the general assembly are notably absent from the Bill of Rights of article I of the Iowa Constitution with two exceptions. The general assembly "may authorize" a jury of less than twelve under article I, section 9. Iowa Const. art. I, § 9. Additionally, the general assembly "may provide" that persons may be held to answer for a criminal offense without the intervention of a grand jury. *Id.* art. I, § 11. But other than these two provisions, nothing in the Iowa Bill of Rights requires legislative action to ensure enforcement.

We think it clear that section 1 of the schedule article cannot swallow up the power of the judicial branch to craft remedies for constitutional violations of article I. The rights established in the Iowa Bill of Rights are not established by legislative grace, but by the people in

---

[5]For example, article III, sections 34 and 35 provided that the general assembly shall fix the number of senators "by law," and shall "fix" the ratio of representatives. Iowa Const. art. III, §§ 34 & 35. Article IV, section 5 stated the general assembly shall provide for contested elections "in such manner as may be prescribed by law." *Id.* art. IV, § 5. Article IV, section 16 declared the Governor may remit fines and forfeitures in such manner "as may be prescribed by law." *Id.* art. IV, § 16. Article V, section 12 stated the general assembly shall "provide, by law" for the election of an attorney general. *Id.* art. V, § 12. Article V, section 14, declared it is "the duty of the General Assembly to provide for the carrying into effect of this [judicial] article." *Id.* art. V, § 14. Article V, section 6 declared district courts shall have jurisdiction "as shall be prescribed by law." *Id.* art. V, § 6. Article VIII, section 1 declared the general assembly "shall provide, by general laws" for the organization of all corporations. *Id.* art. VIII, § 1. Article IX, section 5 declared the general assembly "shall take measures for the protection, improvement, or other disposition" of public land. *Id.* art. IX:2, § 5. Article IX, section 7 declared that school funds may be distributed "as may be provided by the General Assembly." *Id.* art. IX:2, § 7. Article X, section 1 stated the general assembly "shall provide by law" for the publication of proposed amendments to the constitution and the election of delegates to the constitutional convention. *Id.* art. X, § 1.

adopting the constitution. The Iowa Bill of Rights was a big deal to the framers. We divine no desire of the 1857 framers to prevent the Iowa judiciary from performing its traditional role from a schedule article requiring the general assembly to enact necessary laws for the transition to the new constitutional government. *See State v. Buckner,* 121 A.3d 290, 298 (N.J. 2015) (noting a schedule article "contains various phase-in provisions designed to facilitate the smooth transition to the 1947 constitution and several subsequent amendments" (quoting Robert F. Williams, *The New Jersey State Constitution* at 197 (2d ed. 2012))). The rights and remedies of the Bill of Rights are not subject to legislative dilution as "there is no elasticity in the specific guaranty of the Constitution." *Des Moines Joint Stock Land Bank of Des Moines v. Nordholm,* 217 Iowa 1319, 1367, 253 N.W. 701, 725 (1934) (Claussen, C.J., dissenting). It would be a remarkable development to allow a provision in the schedule article of the Iowa Constitution to eviscerate the power of courts to provide remedies for violations of the people's rights established in article I, the article which the framers plainly thought, bar none, contained the most important provisions in the Iowa Constitution.[6]

---

[6]A leading commentator of the Iowa Constitution, Benjamin F. Shambaugh, notes that the proposed Iowa Constitution of 1844 contained an article XIII, he describes as "a 'Schedule' for transition from Territorial to State organization." Shambaugh, at 153. Shambaugh further notes that the Iowa Constitution of 1846 also had a schedule article, article XIII. *Id.* at 197. It provided that the Governor should proclaim the time to hold the first general election within three months of the constitution's adoption, the Governor should set the date of the first meeting of the general assembly, and that the first general assembly must meet within four months of ratification. *Id.* at 197–98. With respect to the Iowa Constitution of 1857, Shambaugh notes that article XII, also entitled "Schedule," provided for election of officers under the new constitution, a provision for submitting the constitution to the people for ratification, and a provision for an election to strike the word "white" from the article on the Right of Suffrage. *Id.* at 279–80. Shambaugh does not suggest that any of these

3. *Standard for determining self-execution.* The federal standard for self-execution was described in *Davis*—

> A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, . . . and it is not self-executing when it merely indicates principles . . . .
>
> . . . In short, if [it is] complete in itself, it executes itself.

179 U.S. at 403, 21 S. Ct. at 212. Ordinarily, a self-executing provision does not contain a directive to the legislature for further action. *Convention Ctr. Referendum Comm. v. Bd. of Elections & Ethics*, 399 A.2d 550, 552 (D.C. 1979). A provision is self-executing when it takes effect immediately "without the necessity for supplementary or enabling legislation." *Brown*, 674 N.E.2d at 1137; *see also Corum*, 413 S.E.2d at 289.

4. *Application of self-execution standard to due process claims involving liberty and property interests.* The United States Supreme Court considered whether claims under the Due Process Clause of the Fifth Amendment of the United States Constitution were enforceable in a *Bivens* action in *Passman*, 442 U.S. at 230, 99 S. Ct. at 2269. The Supreme Court concluded that they were. *Id.* at 244, 99 S. Ct. at 2276. Instead of using the term "self-execution," however, the *Passman* Court considered whether the plaintiff had a "cause of action," due to how the case was decided below and argued before the Court. *Id.* at 232, 99 S. Ct. at 2270. The Court concluded the ambiguous term "cause of action" meant, in *Passman*, whether the plaintiff had a judicially enforceable right under the Due Process Clause of the Fifth Amendment,

---

"Schedule" articles had dramatic implications for the scope of the rights and remedies established in article I of any of the Iowa Constitutions.

a meaning essentially analogous to asking whether the Due Process Clause was self-executing. *Id.* at 239, 99 S. Ct. at 2274. The Court declared that for the rights guaranteed in the Constitution to be more than mere wishes or requests, litigants must be able to enforce those rights in the courts when there is no other effective means to enforce them. *Id.* at 242, 99 S. Ct. at 2275. The Court explained it had long recognized equal protection actions under the Due Process Clause of the Fifth Amendment. *Id.*; *see Bolling v. Sharpe*, 347 U.S. 497, 498–99, 74 S. Ct. 693, 694 (1954).

A number of state supreme courts, both before and after *Passman*, have come to the same conclusion, usually utilizing more conventional self-execution language. *See Feldman v. City of Chicago*, 2 N.E.2d 102, 105 (Ill. 1936) (holding due process is self-executing and needs no statutory enactment); *Ashton v. Brown*, 660 A.2d 447, 462 (Md. 1995); *Widgeon*, 479 A.2d at 923 n.5, 930; *In re Wretlind*, 32 N.W.2d 161, 167 (Minn. 1948) (holding due process clause requires no legislation for enforcement); *State v. Kyle*, 65 S.W. 763, 767 (Mo. 1901) (due process clause is addressed to the courts, not the legislature); *Dorwart*, 58 P.3d at 136; *Remley v. State*, 665 N.Y.S.2d 1005, 1008 (Ct. Cl. 1997) (holding due process clause self-executing); *see also Old Tuckaway Assocs. Ltd. P'ship v. City of Greenfield*, 509 N.W.2d 323, 328, 330 (Wis. Ct. App. 1993) (considering the merits of a direct due process claim).

We have found the due process clause of article I, section 9 of the Iowa Constitution capable of enforcement in a number of settings that did not involve damages. For instance, in *Hensler v. City of Davenport*, we enforced the Iowa due process clause directly by finding that a provision of a municipal ordinance which imposed a presumption of failure to exercise reasonable parental control when a child is delinquent

violated a parent's right to due process. 790 N.W.2d 569, 588–90 (Iowa 2010). We have held that procedural due process must be afforded when an at-will public employee is discharged for reasons of dishonest, immoral, or illegal conduct. *Borschel v. City of Perry*, 512 N.W.2d 565, 568 (Iowa 1994).

In short, we have found the due process clause of article I, section 9 enforceable in a wide variety of settings. Iowa courts have ensured, to use *Davis* language, that "the right given may be enjoyed and protected." 179 U.S. at 403, 21 S. Ct. at 212. The Iowa constitutional provision regarding due process of law is thus not a mere hortatory command, but it has been implemented, day in and day out, for many, many years. It has traditionally been self-executing without remedial legislation for equitable purposes, and there is no reason to think it is not self-executing for the purposes of damages at law.

5. *Application of self-executing standard to equal protection.* In *Passman,* the United States Supreme Court found that the Equal Protection Clause of the Fifth Amendment of the United States Constitution was a self-executing provision sufficient to support a *Bivens*-type direct damages action. 442 U.S. at 244, 99 S. Ct. at 2276. According to *Passman*, "the judiciary is clearly discernible as the primary means" through which the right to equal protection may be enforced. *Id.* at 241, 99 S. Ct. at 2275. The *Passman* Court quoted James Madison stating, when presenting the Bill of Rights to Congress, that when rights are incorporated into the Constitution, the judiciary will then consider themselves the guardian of those rights and thus serve as "an impenetrable bulwark against every assumption of power in the Legislative or Executive; [the judiciary] will be naturally led to resist every encroachment upon rights." *Id.* at 241–42, 99 S. Ct. at 2275 (quoting 1

Annals of Congress 439 (1789)). The Equal Protection Clause was thus intended to be, and understood to be, enforceable by the judiciary. *See id.* at 244, 99 S. Ct. at 2276.

Similarly, in *Brown*, the Court of Appeals of New York held the New York Constitution's equal protection clause was self-executing. 674 N.E.2d at 1137. The *Brown* court explained that the right to equal protection in the New York Constitution is "[m]anifestly" self-executing because it "define[s] judicially enforceable rights and provide[s] citizens with a basis for judicial relief against the State if those rights are violated." *Id.* The equal protection provision "imposes a clear duty on the State and its subdivisions to ensure that all persons in the same circumstances receive the same treatment. *Id.* at 1140.

A number of other states have found the equal protection provisions of state constitutions to be self-executing. *See, e.g., State v. Planned Parenthood of Alaska*, 35 P.3d 30, 44 (Alaska 2001) (considering merits of direct equal protection claim); *Unger v. Super. Ct.*, 692 P.2d 238, 239–43 (Cal. 1984) (en banc) (considering merits of direct equal protection claim); *Baker v. Miller*, 636 N.E.2d 551, 558 (Ill. 1994) (holding constitutional provision directly prohibiting discrimination in employment was self-executing); *Layne v. Superintendent*, 546 N.E.2d 166, 168–69 (Mass. 1989) (considering the merits of a direct equal protection claim); *Smith v. Dep't of Pub. Health*, 410 N.W.2d 749, 798 (Mich. 1987) (considering the merits of a direct equal protection claim); *In re Town Highway No. 20*, 45 A.3d 54, 67 (Vt. 2012) (holding article of state constitution prohibiting discriminatory treatment to be self-executing).

We, of course, have not hesitated to enforce the equal protection clauses of the Iowa and Federal Constitutions. For example, in *Varnum*

we held that a law prohibiting same-sex marriage violated equal protection because there was no justification for the classification which substantially furthered any governmental objective. 763 N.W.2d at 906–07. In *Dudley*, we held a statute which provided for less advantageous treatment for indigent, acquitted criminal defendants than for ordinary civil judgment debtors violated the Equal Protection Clause because there was no rational basis for the classification. 766 N.W.2d at 617. In *In re S.A.J.B.*, we held a statute providing that indigent parents defending involuntary parental rights termination proceedings under Iowa Code chapter 232 could receive state-appointed counsel but indigent parents defending involuntary parental rights termination proceedings under chapter 600A could not have state-appointed counsel was a violation of equal protection. 679 N.W.2d 645, 651 (Iowa 2004). In *Glowacki v. State Board of Medical Examiners*, we held that a statute prohibiting the grant of a stay in a suspension of a doctor's license to practice medicine, but permitting stays in other professional licensure investigations, violated a doctor's right to equal protection. 501 N.W.2d 539, 542 (Iowa 1993).

Our cases clearly show that our equal protection clause has always been considered to be self-executing. We therefore reaffirm the equal protection clause of the Iowa Constitution is self-executing.

**IV. Preemption of Iowa Constitutional Claims by the Iowa Civil Rights Act.**

**A. Introduction.** The defendants suggest that any potential constitutional claim that Godfrey may have is preempted by the Iowa Civil Rights Act. At the outset, however, it is important to distinguish between preemption and the question of adequacy of the statutory remedy.

Preemption is a question of legislative intent. *Ackerman v. Am. Cyanamid Co.*, 586 N.W.2d 208, 211 (Iowa 1998). When the legislature expressly preempts common law or other fields of law, there is no problem of statutory interpretation. *State v. Martinez*, 896 N.W.2d 737, 763 (Iowa 2017). The fighting issue in the preemption area is when the legislature is silent but has enacted a sufficiently comprehensive statute to suggest an implied legislative intent to occupy the field or has enacted a statute so in conflict with other legal claims that preemption must be implied. *See id.* at 746.

The question of whether a statutory remedy might be adequate so as to avoid the need for a direct constitutional claim has nothing to do with legislative intent. It has everything to do with a judicial determination of whether the court should not allow a direct constitutional claim for damages to proceed because the court believes an established statutory remedy is sufficient to vindicate the constitutional interests of the people expressed in the civil liberties provisions of state constitutions.

**B. Positions of the Parties.** Godfrey argues that Iowa constitutional rights are not preempted by Iowa Code chapter 216. Godfrey points to differences between constitutional claims and common law claims, which may be preempted under the Iowa Civil Rights Act. The sources of the rights are different and the available remedies are different. Statutory rights may be abolished by the legislature, whereas constitutional rights may only be abolished by constitutional amendment.

Godfrey directs our attention to three cases from other jurisdictions as persuasive authority standing for the premise that constitutional rights are fundamentally different from, and thus may not

be preempted by, statutory rights. *See Laird v. Ramirez*, 884 F. Supp. 1265 (N.D. Iowa 1995); *Shuttleworth v. Broward County*, 639 F. Supp. 654 (S.D. Fla. 1986); *Wintergreen Grp. LC v. Utah Dep't of Transp.*, 171 P.3d 418 (Utah 2007). He also cites an Iowa case as standing for the premise that a plaintiff may pursue all appropriate remedies concurrently. *See Gray v. Bowers*, 332 N.W.2d 323, 324 (Iowa 1983).

Godfrey concludes by arguing that even if the Iowa Civil Rights Act did preempt constitutional claims, it would only preempt his allegation of discrimination based on sexual orientation, not his allegation of partisan discrimination which is not covered by the Act.

The defendants argue that Iowa Code chapter 216 is the exclusive remedy for conduct in violation of the Iowa Civil Rights Act. In support of this argument, the defendants cite our cases holding that common law torts are preempted by the Iowa Civil Rights Act. *See, e.g., Greenland v. Fairtron Corp.*, 500 N.W.2d 36, 38 (Iowa 1993); *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 638 (Iowa 1990); *Northrup v. Farmland Indus. Inc.*, 372 N.W.2d 193, 197 (Iowa 1985). The defendants state these and related cases stand for the rule that if discrimination is an element of a claim, then the claim is not separate and independent from the Act and is thus preempted.

Because the operative facts that give rise to constitutional claims are the same facts as those that Godfrey relies on for his constitutional claims, this proves, the defendants argue, the claims are not separate and independent from the Iowa Civil Rights Act. Therefore, the defendants conclude the constitutional claims are preempted.[7]

_____

[7]The defendants make no direct or indirect argument in their brief with respect to the Federal Tort Claims Act, 28 U.S.C. §§ 2671–80, the Iowa Tort Claims Act, Iowa Code chapter 669, or to the doctrine of sovereign immunity. The defendants' briefing

**C. Discussion.** There is little doubt the legislature has the power to supersede or abrogate common law remedies. Mark A. Geistfeld, *Tort Law in the Age of Statutes*, 99 Iowa L. Rev. 957, 1004 (2014); Marie K. Pesando, *Change or Abrogation by Statute or Constitution*, 15A Am. Jur. 2d *Common Law* § 15, at 741 (2011); Kimberly C. Simmons, *Pre-emption of Wrongful Discharge Cause of Action by Civil Rights Laws*, 21 A.L.R.5th 1 (1994).

We have held that the Iowa Civil Rights Act preempts some, but not all, common law claims based on discrimination. In *Northrup*, for example, we held that an employee who claimed his job was terminated because he participated in an alcohol treatment plan did not have a common law wrongful discharge claim. 372 N.W.2d at 195–97. We explained that employment contracts are presumed to be at-will under Iowa law and we had not previously recognized a public policy exception to the rule. *Id.* at 196. The Iowa Civil Rights Act, however, allowed for such an action after following its procedures to first seek administrative relief. *Id.* We said, "It is clear from a reading of [the Act] that the procedure under the civil rights act is exclusive, and a claimant asserting a discriminatory practice must pursue the remedy provided by the act." *Id.* at 197. The employee also raised a claim of intentional infliction of emotional distress related to the discriminatory practice—the employer did not argue that the emotional distress action was also preempted by the Iowa Civil Rights Act because we did not consider the issue. *Id.* at 197–98.

---

focuses solely on Iowa caselaw considering whether the Iowa Civil Rights Act preempts common law claims and argues, by analogy, that Iowa constitutional claims should also be preempted.

Subsequent to *Northrup,* we recognized that an at-will employee could pursue an action for wrongful discharge if the discharge violated public policy—but, if the wrongful acts complained of violated the Iowa Civil Rights Act, the Act was the sole remedy for the wrongful discharge claim. *Vaughn,* 459 N.W.2d at 637–38 (Iowa 1990); *see also Smidt v. Porter,* 695 N.W.2d 9, 17 (Iowa 2005); *Borschel,* 512 N.W.2d at 567–68; *Hamilton v. First Baptist Elderly Hous. Found.,* 436 N.W.2d 336, 341 (Iowa 1989). We also held, however, that a breach of employment contract claim based on the same facts as the claim of wrongful discharge was not preempted by the Act. *Vaughn,* 459 N.W.2d at 638–39; *see also Grahek v. Voluntary Hosp. Co-op. Ass'n of Iowa, Inc.,* 473 N.W.2d 31, 33–34 (Iowa 1991) (rejecting argument that employee's breach of contract claim was merely an artfully pled claim of discrimination). *But see Polk Cty. Secondary Roads v. Iowa Civil Rights Comm'n,* 468 N.W.2d 811, 816–17 (Iowa 1991) (holding contractual claim preempted by Iowa Civil Rights Act when breach was failure to follow union's arbitration agreement and dispute resolution provision of Act rendered arbitration inappropriate).

In *Greenland,* we explained that when a common law claim requires "proof of discrimination," the claim is preempted by the Iowa Civil Rights Act. 500 N.W.2d at 38. However, when a claim is separate and independent, it is an incidental cause of action and is not preempted. *Id.* In *Greenland,* we found the employee's emotional distress claim was preempted because the outrageous conduct complained of was discrimination. *Id.* The employee's assault and battery claims, however, were not preempted because they were "complete without any reference to discrimination." *Id.* at 38–39; *see also Channon v. United Parcel Serv., Inc.,* 629 N.W.2d 835, 858 (Iowa

2001) (upholding *Greenland* in dismissing emotional distress claim and rejecting the argument that *Greenland* was inconsistent with *Northrup*).

**D. Discussion of Preemption of Constitutional Claims.** We have not heard a case concerning whether the Iowa Civil Rights Act preempts otherwise valid constitutional claims. For that matter, we have not heard a case concerning whether any legislative act can ever preempt a constitutional claim. In our caselaw, we have indicated a distinction between constitutional claims and claims brought under the Iowa Civil Rights Act. As we noted in *Sommers v. Iowa Civil Rights Commission*, we were not "examining civil liberties protected by the Constitution, but civil rights which are enforceable claims rooted in the Iowa Civil Rights Act." 337 N.W.2d 470, 472 (Iowa 1983). In several cases, we considered the merits of constitutional claims brought in tandem with statutory claims under the Iowa Civil Rights Act. *See McQuiston v. City of Clinton*, 872 N.W.2d 817, 832, 836 (Iowa 2015) (rejecting claims of equal protection and due process on the merits, but remanding on the question of pregnancy discrimination under the Iowa Civil Rights Act). In these cases, however, the question of preemption does not appear to have been raised.

The long-settled principle is that a constitution trumps legislative enactments. *See generally Marbury*, 5 U.S. at 138 ("An act of congress repugnant to the constitution cannot become a law."); *Baldon*, 829 N.W.2d at 803–10 (Appel, J., concurring) (describing the process of enacting state constitutions after independence and emphasizing the importance of state constitutions in the federal system). *See generally* Walt Cubberly, *New Foundations for Constitutional Adjudication in State Court*, 24 App. Advoc. 425 (2012) (exploring classic philosophical problems with constitutional review in the context of state

constitutionalism).  A basic premise of our constitutional system is that popular whim may not override the individual rights guaranteed by the Constitution.  *Cf. Cox v. Louisiana*, 379 U.S. 559, 562, 85 S. Ct. 476, 479–80 (1965).  Under the Iowa Constitution, a constitutional right may not be altered by ordinary legislation, but the constitution may be amended according to the procedures for amendment in article 10.  Iowa Const. art. X, §§ 1–3.

If we held that a statute might preempt an otherwise valid constitutional action, this would in effect grant ordinary legislation the power to cabin constitutional rights.  The Iowa Constitution would no longer be the supreme law of the state.  *See* Iowa Const. art. XII, § 1.  The amendment process in article X of the Iowa Constitution would be rendered superfluous.  We thus refuse to apply classic preemption doctrine to the question of whether a *Bivens*-type damage remedy is available under the Iowa Constitution.  *See Greenway Dev. Co. v. Borough of Paramus*, 750 A.2d 764, 770 (N.J. 2000) ("A public entity may not use a state statute . . . to abrogate a claimant's constitutional rights."); *Wintergreen Grp.*, 171 P.3d at 420 ("A constitutional cause of action . . . is presumptively superior to and must displace any statutory iteration that either conflicts with it or gives it less than full effect.").

**V.  Judicial Inaction Due to Adequacy of Legislative Remedy.**

**A.  Introduction.**  We now consider a question different than preemption.  As indicated above, the central question in a preemption analysis is determining what the legislature intended when it enacted a statute.  On the issue of adequacy, the decision-maker is the court.  Specifically, the question here is whether the court believes the remedy provided by the Iowa Civil Rights Act should be considered sufficiently robust that the court should, as a matter of discretion, decline to allow

plaintiff to pursue a parallel direct constitutional claim for money damages.

**B. Due Process Claims Based Upon Liberty and Property Interests.** While much of Godfrey's complaint focuses on discrimination based on sex or sexual orientation, Godfrey also has alleged that his property and liberty interests in employment and in his reputation have been violated by the partisan motivation of the defendants. The claims are based on alleged violations of procedural and substantive due process.

The due process claims based on alleged partisan motivation in depriving Godfrey of property and liberty interests contrary to due process are not claims within the scope of the Iowa Civil Rights Act. As a result, there is no basis to assert that Iowa Code chapter 216 provides an adequate remedy to avoid the necessity of a free-standing damages claim. *See Passman*, 442 U.S. at 247, 99 S. Ct. at 2278 (holding when congressional staffer not in the competitive service not covered by Title VII, equal protection damages remedy available); *Knutson v. Sioux Tools, Inc.*, 990 F. Supp. 1114, 1120 (N.D. Iowa 1998); *Thompto v. Coborn's Inc.*, 871 F. Supp. 1097, 1111 (N.D. Iowa 1994). As a result, the district court erred in dismissing Godfrey's direct damages claim on these counts.

An amicus brief attacks the merits of Godfrey's due process claims as being "vague" and generally inadequate. The state defendants, however, did not advance this question before the district court or on appeal. One of the disadvantages of interlocutory appeal is the piecemeal consideration of issues. Nonetheless, the question of the merits of Godfrey's property claim cannot be resolved at this time. It goes without saying, of course, that we take no view on the merits of any due process claim raised in this case.

**C. Adequacy of Legislative Remedy Under the Iowa Civil Rights Act.** The Iowa Civil Rights Act provides a substantial remedy for discrimination of various kinds. No one can doubt that it is a substantial remedy, allowing recovery for back wages, front wages, emotional distress, and attorneys' fees. There is caselaw from other states supporting the general principle that a constitutionally adequate statutory remedy may be sufficient to allow a court to decline to permit a parallel direct constitutional claim. *See, e.g., Dilley v. Americana Healthcare Corp.*, 472 N.E.2d 596, 603 (Ill. Ct. App. 1984); *Provens v. Stark Cty. Bd. of Mental Retardation & Developmental Disabilities*, 594 N.E.2d 959, 965–66 (Ohio 1992). As noted by the Supreme Court of Colorado, legislation implementing constitutional rights "is permissible as long as it does not directly or indirectly impair, limit, or destroy the rights that the executing . . . provision provides." *Cacioppo v. Eagle Cty. Sch. Dist. Re–50J*, 92 P.3d 453, 463 (Colo. 2004) (en banc). On this issue, three members of the court conclude that the Iowa Civil Rights Act does not preempt the plaintiff's *Bivens*-type constitutional claims, while a majority conclude that the district court properly dismissed Godfrey's Iowa constitutional claims based upon Iowa equal protection principles because of the adequacy of remedies under the Iowa Civil Rights Act. What follows is a discussion of why three members of the court conclude the legislative remedy is inadequate and thus why the *Bivens*-type equal protection claims should be allowed to proceed.

In considering whether we should consider the adequacy of the Iowa Civil Rights Act for claims of discrimination in employment in violation of the equal protection clauses of the Iowa Constitution, there are two factors that give us pause. First, an independent constitutional claim advances separate interests. Second, the Iowa Civil Rights Act

does not allow punitive damages. *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 689 (Iowa 2013).

A constitutional violation is different from an ordinary dispute between two private parties. As Justice Harlan noted in *Bivens*, "[I]njuries inflicted by officials acting under color of law, while no less compensable in damages than those inflicted by private parties, are substantially different in kind . . . ." *Bivens*, 403 U.S. at 409, 91 S. Ct. at 2011. When a constitutional violation is involved, more than mere allocation of risks and compensation is implicated. The emphasis is not simply on compensating an individual who may have been harmed by illegal conduct, but also upon deterring unconstitutional conduct in the future. As noted by one commentator, punitive damages are available to "express sharp *social* disapproval" as well as prevent recurrence of unconstitutional conduct. Thomas J. Madden et al., *Bedtime for* Bivens*: Substituting the United States as Defendant in Constitutional Tort Suits*, 20 Harv. J. on Legis. 469, 489–90 (1983) (emphasis added). Additionally, the United States Supreme Court noted that punitive damages "are especially appropriate to redress the violation by a Government official of a citizen's constitutional rights." *Carlson*, 446 U.S. at 22, 100 S. Ct. at 1473. Similarly, in *Smith v. Wade*, the Court emphasized that "*society* has an interest in deterring and punishing *all* intentional or reckless invasions of the rights of others." 461 U.S. 30, 54, 103 S. Ct. 1625, 1639 (1983) (first emphasis added). Vindication of the social interest is distinct from adequate compensation goals of tort law and most statutory remedies, including those under Iowa Code chapter 216.

*Bivens*, *Carslon*, and *Smith* thus teach that a constitutional claim is designed "to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the

Government as an instrument of popular will." Rosalie Berger Levinson, *Recognizing a Damage Remedy to Enforce Indiana's Bill of Rights*, 40 Val. U. L. Rev. 1, 11 (2005) (quoting *Bivens*, 403 U.S. at 404, 91 S. Ct. at 2008); *see also Sommers*, 337 N.W.2d at 472 (distinguishing between civil liberties protected by the Constitution and civil rights claims which are enforceable by statute). The focus in a constitutional tort is not compensation as much as ensuring effective enforcement of constitutional rights. Michael Wells, *Punitive Damages for Constitutional Torts*, 56 La. L. Rev. 841, 858–62 (1996) [hereinafter Wells, *Punitive*] (noting constitutional torts protect different interests and the focus on a constitutional tort is not on compensation but on development of an effective system of constitutional remedies). The harm to society is not captured by a judgment that solely compensates a plaintiff for his injury. *See* Michael Wells, *Constitutional Remedies, Section 1983 and the Common Law*, 68 Miss. L.J. 157, 189 (1998). A gap thus exists between the injury incurred by the plaintiff and the total harm to society caused by a constitutional violation. *See id.* Constitutional torts and common law torts thus protect different interests. Wells, *Punitive*, 56 La. L. Rev. at 863.

A number of cases agree with the notion that constitutional rights are distinguishable from common law or statutory claims. *See Laird*, 884 F. Supp. at 1284 (holding remedial scheme of social security act designed to vindicate statutory rights not constitutional rights); *Wintergreen Grp.*, 171 P.3d at 422 ("[O]wing to its different lineage, a constitutional cause of action can never be preempted by statute, regardless of how fully the statute honors the contours of the constitutional claim."). Because the interests being vindicated are different, parallel claims are appropriate. *See Johnson v. Ry. Express*

*Agency, Inc.*, 421 U.S. 454, 461, 95 S. Ct. 1716, 1721 (1975) (noting that remedies available under Title VII "although related, and although directed to most of the same ends, are separate, distinct, and independent" from claims of discrimination under 42 U.S.C. § 1981). Consistent with the distinction between constitutional torts and common law tort or statutory claims, federal courts have frequently held that punitive damages are available in constitutional tort cases when no compensatory damages are awarded, while punitive damages in other cases are generally not available absent compensatory damages. *See* William H. Volz & Michael C. Fayz, *Punitive Damages and the Due Process Clause: The Search for Constitutional Standards*, 69 U. Det. Mercy L. Rev. 459, 498 nn.188 & 189 (1992) (citing cases).

The difference between a purely private claim and a constitutional claim which necessarily involves a strong social interest in enforcement is illustrated by the importance of the availability of punitive damages. The substantial traditional authority for the proposition that the availability of individual liability for punitive damages is an important factor in determining whether a court should permit a direct action for money damages. In *Huckle,* the Lord Chief Justice conceded that the actual damages were small, but defended the jury's award of £ 300, noting, "I think they have done right in giving exemplary damages." 95 Eng. Rep. at 769. Similarly, in *Ashby v. While*, the jury awarded the hefty sum of £ 200 for violation of the right to vote. (1703) 92 Eng. Rep. 126, 127–28. Historically, then, punitive damages played an important role in the enforcement of individual rights against the government.

There is caselaw from the United States Supreme Court that supports the importance of punitive damages in the panoply of constitutional remedies. In *Carlson,* the Court noted the lack of

availability of punitive damages was an important factor in finding that a remedial scheme was inadequate to protect constitutional rights. 446 U.S. at 22, 100 S. Ct. at 1473. The *Carlson* approach was consistent with *Frazier v. Parsons*, where the Supreme Court of Louisiana declared

> "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . . ," would be a mockery if courts . . . failed to inflict exemplary damages for the wanton abuse of the personal liberty and private rights of property.

24 La. Ann. 339, 341 (La. 1872) (emphasis omitted).

Other authorities agree. For instance, in *Dunbar Corp. v. Lindsey*, the Fourth Circuit noted that "[t]he underlying purpose of the Bill of Rights is to protect the people from the power of the government." 905 F.2d 754, 763 (4th Cir. 1990). Further, the Fourth Circuit noted that if a *Bivens*-type action were not found, the claimant lacked any remedy effective against individual defendants and for punitive damages.[8] *Id.*; *see also Taylor v. Bright*, No. 00–6676, 2000 WL 1144624, at *2 (4th Cir. Aug. 14, 2000) (per curiam) (citing lack of punitive damages or injunctive relief under Federal Tort Claims Act as not barring § 1983 action). Similarly, in *Newell v. City of Elgin*, the Illinois court noted the lack of exemplary damages against a municipality in a statutory scheme as being a factor in allowing a *Bivens* claim. 340 N.E.2d 344, 350 (Ill. App. Ct. 1976). Conversely, it is sometimes said that an administrative remedy was adequate because the plaintiff could recover punitive

---

[8]The Iowa Civil Rights Act allows for individual liability for supervisors. It is not clear whether all of the defendants are supervisors. *See Vivian v. Madison*, 601 N.W.2d 872, 874 (Iowa 1999). To the extent the individual defendants are not "supervisors" of Godfrey, they are not within the scope of the Iowa Civil Rights Act and there is no adequate remedy as to them.

damages. *Bishop v. Holy Cross Hosp. of Silver Spring*, 410 A.2d 630, 632 (Md. Ct. Spec. App. 1980).

The necessity of the availability of punitive damages in light of the social interests in enforcement of constitutional rights as contrasted to private claims has support in modern caselaw. As noted in *Bivens*, a government official acting unlawfully in the name of the state "possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own." 403 U.S. at 392, 91 S. Ct. at 2002 (majority opinion). We recognize, however, that there is authority to the contrary. *See Provens*, 594 N.E.2d at 965 (holding statutory remedies adequate even though not equal to the other remedies that might be available). But the social interest in enforcement of constitutional claims, supported by punitive damages as in *Wilkes*, *Huckle*, and *Entick*, demonstrates the distinctive nature of constitutional harms.

An amicus brief raises the concern about dampening the ardor of the Governor and other public officers in the exercise of their duties. But this argument, in fact, cuts in favor of a cause of action for damages. History is replete with examples of powerful public figures who, in their desire to do good, have trampled on the constitutional rights of the people. As Justice Brandeis observed, "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent." *Olmstead v. United States*, 277 U.S. 438, 479, 48 S. Ct. 564, 572 (1928) (Brandeis, J., dissenting), *overruled in part on other grounds by Berger v. New York*, 388 U.S. 41, 50–51, 87 S. Ct. 1873, 1879 (1967).

In any event, to the extent that a *Bivens*-type action might inhibit their duties, the doctrine of qualified immunity is the appropriate vehicle to address those concerns. The state courts that have considered whether immunity applies in *Bivens*-type actions are divided. *See, e.g.,*

*Moresi*, 567 So. 2d at 1093 (holding qualified immunity applies); *Corum,* 413 S.E.2d at 291 (holding no qualified immunity). The issue of qualified immunity, however, is not before the court today.

In conclusion, for the above reasons, we think the different nature of the interests protected weighs in favor of allowing a *Bivens*-type claim to go forward against the defendants. We do not find authority to the contrary persuasive.

**D. The Question of "Special Factors."** An amicus brief in this case suggests that we should decline to find a direct monetary cause of action in this case because of "special factors." As the amici correctly point out, the United States Supreme Court has developed a special-factors doctrine which allows the Supreme Court to decline to permit a direct damage action for a constitutional violation to go forward. *See United States v. Stanley,* 483 U.S. 669, 678–84, 107 S. Ct. 3054, 3061–64 (1987); *Bush,* 462 U.S. at 380, 103 S. Ct. at 2413. The question of whether special factors are present under the United States Supreme Court cases goes to the appropriateness of the remedy, not to the court's remedial power.

The special-factors doctrine is a standardless exception that provides the court with a convenient escape hatch. In other words, a *Bivens* claim exists except where a majority of the court finds it inconvenient. To the extent it has any appeal, the special-factors exception has some purchase when applied to the federal government's military operations. In *Chappell,* the Supreme Court held that because of the unique disciplinary structure of the military, it would not allow a *Bivens*-type action by an enlisted seaman who brought a discrimination claim against superiors. 462 U.S. at 304, 103 S. Ct. at 2368. Further, there is at least arguably a textual commitment to a different

constitutional regime arising under the powers of the President as commander-in-chief.

But we see no basis for implementing a special-factors doctrine here. First, there is a preservation problem. The issue of special factors was not raised in the State's appellate brief. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) (declining to consider issue which was not argued). Second, on the facts presented, we are not prepared to announce the adoption of the amorphous, ad hoc special-factors doctrine. Instead, as noted above, concerns about dampening the ardor of executive officials should be addressed through other channels such as the availability of qualified immunity.

## VI. Conclusion.

For the above reasons, the holding of the district court in this matter is reversed as to Counts VI and VII. We emphasize our holding is based solely on the legal contentions presented by the parties. We express no view on other potential defenses which may be available to the defendants and no view whatsoever on the underlying merits of the case. We hold only that the defendants are not entitled to summary judgment on Counts VI and VII based on the legal contentions raised in this appeal. Costs on appeal are to be taxed one-half to Godfrey and one-half to the defendants.

**AFFIRMED IN PART AND REVERSED IN PART.**

Wiggins and Hecht, JJ., join this opinion. Cady, C.J., joins in part and files a concurrence in part and dissent in part. Mansfield, Waterman, and Zager, JJ., dissent.

**CADY, Chief Justice (concurring in part and dissenting in part).**

I concur in the opinion of the court to the extent it would recognize a tort claim under the Iowa Constitution when the legislature has not provided an adequate remedy. I part ways with the majority opinion because I find the Iowa Civil Rights Act (ICRA) provides that remedy here, at least with respect to Christopher J. Godfrey's claim against the State for discrimination on the basis of sexual orientation.

Godfrey alleges the State discriminated against him on the basis of his sexual orientation by harassing him and reducing his salary. These claims are covered by the ICRA. *See* Iowa Code § 216.6(1)(*a*) (2013). Thus, Godfrey may only assert an independent claim under the Iowa Constitution, *cf. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 392, 91 S. Ct. 1999, 2002 (1971), if he can establish the remedy provided by the ICRA is inadequate to vindicate his constitutional rights, *cf. id.* at 407, 91 S. Ct. at 2010 (Harlan, J., concurring in judgment). Godfrey seeks punitive damages, but punitive damages are not available under the ICRA. *See City of Hampton v. Iowa Civil Rights Comm'n*, 554 N.W.2d 532, 537 (Iowa 1996) ("Our civil rights statute does not allow for punitive damages.").

The importance of punitive damages was an essential part of the United States Supreme Court's opinion in *Carlson v. Green*, 446 U.S. 14, 22, 100 S. Ct. 1468, 1473 (1980). In *Carlson*, a plaintiff alleged that his due process, equal protection, and protection from cruel and unusual punishment rights were violated because prison officials failed to provide him with proper medical attention while he was in their custody. *Id.* at 16, 100 S. Ct. at 1470. The Court asked whether the Federal Tort Claims Act (FTCA) provided the exclusive remedy for the plaintiff. *Id.* at

18–19, 100 S. Ct. at 1471. But because the FTCA explicitly barred punitive damages, the *Carlson* Court found the FTCA "is that much less effective than a *Bivens* action as a deterrent to unconstitutional acts." *Id.* at 22, 100 S. Ct. at 1473. The Court emphasized, without qualification, that punitive damages are "especially appropriate to redress the violation by a Government official of a citizen's constitutional rights." *Id.*

Here, however, the remedies provided in the ICRA are robust, even without punitive damages. I find these remedies suffice as an adequate deterrent of any alleged unconstitutional conduct. First, as to the reduction in salary, Godfrey makes no claim that an action under the ICRA will not adequately provide him with compensatory damages. Further, the ICRA includes a provision for attorney fees. *See* Iowa Code § 216.15(9)(*a*)(8). Obviously, attorney fees cannot replace punitive damages in cases of physical invasion, assault, or violations of other liberty interests, but their availability for a claim of monetary loss is an important factor in assessing the adequacy of a statutory remedy. *See Carlson*, 446 U.S. at 22, 100 S. Ct. at 1473. Regarding Godfrey's claim of harassment, it is true this is not solely for monetary loss. Instead, Godfrey additionally claims emotional distress damages. But the ICRA provides for this, too. *See* Iowa Code § 216.15(9)(*a*)(8); *see also Dutcher v. Randall Foods*, 546 N.W.2d 889, 894 (Iowa 1996) ("[D]amages for emotional distress are a component of 'actual damages.'" (quoting *Chauffeurs, Teamsters & Helpers Local Union 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 383 (Iowa 1986))). Again, Godfrey makes no claim that an action under the ICRA will not adequately compensate him for damages relating to the alleged unconstitutional conduct. Thus, I would find the ICRA an adequate remedy for these claims and would not

recognize an independent constitutional claim under these circumstances.

In the appropriate case, a remedy of punitive damages may be necessary to vindicate a plaintiff's constitutional rights. But when the claimed harm is largely monetary in nature and does not involve any infringement of physical security, privacy, bodily integrity, or the right to participate in government, and instead is against the State in its capacity as an employer, the ICRA exists to vindicate the constitutional right to be free from discrimination. While not providing punitive damages, it provides full compensation and attorney fees. On these facts, I do not believe an independent *Bivens*-type action is necessary for the sole purpose of providing a punitive-damages remedy.

For these reasons, I concur in part and dissent in part. Accordingly, the district court properly dismissed Count VIII (discrimination based on sexual orientation against the State) and Count IX (discrimination based on sexual orientation against the individual defendants) to the extent the individual defendants are employers or supervisors. It is unnecessary to create a constitutional tort for these claims because adequate statutory remedies exist.

**MANSFIELD, Justice (dissenting).**

I respectfully dissent.

### I.  Introduction.

Until today, we have never recognized direct claims under the Iowa Constitution even for actual damages.  Historically the Iowa Constitution has been, and continues to be, a vital check on government encroachment of individual rights.  Our courts enforce that check by invalidating and enjoining actions taken in violation of the constitution.  But we have heretofore indicated that damages claims require either (1) legislative authorization or (2) a footing in the common law of torts, contracts, or some other established common law doctrine.  The appeal before us presents neither.

In 1965, our general assembly passed the Iowa Civil Rights Act (ICRA).  *See* 1965 Iowa Acts ch. 121 (codified as amended at Iowa Code ch. 216 (2009)).  From the beginning, the ICRA has applied to "the state of Iowa or any political subdivision, board, commission, department, institution, or school district thereof."  Iowa Code § 105A.2(5) (1966).  Today, we learn that the general assembly need not have bothered.  Apparently, people who believed they had a civil rights claim against Iowa state or local officials always had a money-damages cause of action, with both actual and punitive damages available.  It just took from 1857 until 2017 for someone to figure it out.

I disagree with the notion that constitutional monetary damage claims are some kind of time capsule that the drafters of our constitution buried in 1857 and that can only be unearthed now through the legal acumen of this court.  The time capsule hasn't been found until now because no one buried it in the first place.  Our framers did not

anticipate that someone could simply walk into court with a constitutional provision in hand and file a lawsuit to recover money, including punitive damages. Thus, they provided in article XII, section 1, "This constitution shall be the supreme law of the state, and any law inconsistent therewith, shall be void. *The general assembly* shall pass all laws necessary to carry this constitution into effect." Iowa Const. art. XII, § 1 (emphasis added).

This constitutional text forecloses the plaintiff's argument and should be the starting-point for analysis, so I will discuss it first (*see* Part II below). I will then discuss the authority put forward by the majority for the view that a private right of action exists under the Iowa Constitution (*see* Part III). Upon examination, the cases cited by the majority demonstrate only that we allow common law torts.

Thereafter, I will turn to a second line of analysis (*see* Part IV). Even if constitutional monetary damage claims were available in Iowa without legislative authorization or a common law basis, they would not be available to remedy discrimination based on sexual orientation. That is because the legislature has already adopted a comprehensive remedial scheme to which the plaintiff has access. On this point, a majority of the court shares my view.

The plaintiff has invoked that comprehensive scheme in the first two counts of his petition, which were filed under the ICRA and are not part of this appeal. Nothing we do today affects those counts. Still, we are upholding the dismissal of all equal protection claims against the State and against the individual defendants acting within the scope of their employment.

Next, I will examine the lead opinion's conclusion that there is a right to recover punitive damages against the State of Iowa (*see* Part V).[9] Leading up to today's decision, the State was the only defendant in this case, and I expect that to continue after today's decision. Meanwhile, the premise of the lead opinion is that there is a constitutional right to sue the State of Iowa under the Iowa Constitution for punitive damages in appropriate cases. This would be a drastic turnabout in Iowa's legal history. We have never recognized a right to recover punitive damages from the State in any circumstance. To do so without the State's consent would violate sovereign immunity. The State has never waived sovereign immunity as to punitive damages, presumably because it believes that taxpayer dollars should not be used to pay punitive damage awards as opposed to funding State programs.

Finally, in the last part of this dissent, I will discuss what I believe to be the limits of today's ruling for *this* litigation, contrasting those limits with the rather broad and uncertain implications of the case for Iowa as a whole (*see* Part VI).

**II. The Majority Incorrectly Downplays the Text of Article XII, Section 1, Which Controls the Outcome Here.**

Any logical analysis of the issues in this case should begin with the relevant constitutional language in article XII, section 1. Unfortunately, it takes the court until page 45 to discuss this provision.

Article XII, section 1 stands for two propositions. First, in the event of a conflict between a law and the constitution, the constitution

---

[9]As I read it, the opinion concurring in part and dissenting in part takes no final position on this issue.

wins.  Second, the constitution is implemented through laws passed by the general assembly.

To put it another way, the constitution has both negative and positive force.  On the negative side, the constitution is a brake that invalidates contrary laws.  On the positive side, the constitution empowers the general assembly to enact any laws needed to achieve its purposes.

In 1859, when the adoption of the Iowa Constitution was still fresh in the minds of everyone, our court read the second sentence of article XII, section 1 in precisely this manner:

> The constitution provides that offenses of a certain grade, shall be tried originally before justices of the peace, and that the latter have exclusive original jurisdiction in such cases.  Constitution, Article 1, section 11.  The Constitution requires the legislature to pass all laws necessary to carry the same into effect.  Cons., Article 12, section 1.  For the purpose of carrying out this requirement of the constitution, the legislature, at its last session, passed an act reducing the punishment in cases of persons convicted of petit larceny, so as to bring it within the constitutional requirement, that such class of offenses be prosecuted originally before justices of the peace.  By the combined force of the constitution, and the laws of the last session, the district court was ousted of jurisdiction in such cases.  Session Laws of 1858, 55.

*State v. Church*, 8 Clarke 252, 254 (Iowa 1859).

A later case reiterates this point.  In *Duncan v. City of Des Moines*, we quoted both sentences of article XII, section 1 and explained, "Our Constitution makers wanted to make sure that this would be the rule adopted.  It announced to the people, 'We are turning the power of the State over to the legislature, but turning it over under the conditions named.' "  222 Iowa 218, 231, 268 N.W. 547, 553 (1936).

The majority overstates.  It urges that without today's decision, the judicial branch would lack power "to craft remedies for constitutional

violations of article 1." This ignores the first sentence of article XII, section 1, which indicates that the Iowa Constitution, including the bill of rights, is supreme and inconsistent laws are void. We enforce this negative check on a regular basis, invalidating actions taken by state and local governments under color of law. And as part of this negative check we have crafted remedies, such as the exclusionary rule and declaratory and injunctive relief, implementing the basic directive of article XII, section 1 that unconstitutional acts are void.

What we have not done in the past 160 years is to go beyond declaring unconstitutional actions "void," which we are authorized to do by the first sentence, and assume *the legislature*'s role under the second sentence. Thus, we have never before permitted damages lawsuits for alleged constitutional violations to go forward in the absence of underlying legislative authority or a recognized common law cause of action. It is simply stunning to me that the majority thinks we need to start allowing such lawsuits today in order to avoid "dramatically undermin[ing] effective judicial enforcement of the Iowa Bill of Rights." Has judicial enforcement been lax up until now?

Rhode Island has the same provision as article XII, section 1 in its constitution and its supreme court has read it the same way as I do. *See* R.I. Const. art. VI, § 1; *Bandoni v. State*, 715 A.2d 580 (R.I. 1998). In *Bandoni*, the plaintiffs sought to bring a damages action for alleged violations of a victims' rights provision contained in the Rhode Island Constitution. *Id.* at 583.

> The extensive discussion that we have given to this issue alone indicates the enormous danger of judicially creating a cause of action when both the constitutional framers and the members of the General Assembly had the same opportunity to create a remedy and yet declined to do so. Instead we are of the opinion that the creation of a remedy in the

circumstances presented by this case should be left to the body charged by our Constitution with this responsibility. *See* R.I. Const. art. 6, sec. 1 ("The general assembly shall pass all laws necessary to carry this Constitution into effect[.]"). In this forum the myriad complex issues presented by the imposition of liability can be fully debated in public. . . .

> . . . .

Under our form of government, . . . the function of adjusting remedies to rights is a legislative responsibility rather than a judicial task, and up until the present time the Legislature has not provided a remedy for those instances in which officials fail to inform crime victims of their rights.

*Id.* at 595–96.

The equal protection clause in the Michigan Constitution ends with language similar to the second sentence of article XII, section 1. It provides, "The legislature shall implement this section by appropriate legislation." Mich. Const. art. I, § 2. Relying on this language, the Michigan Supreme Court held that a plaintiff who allegedly had been a victim of racial discrimination could not pursue a direct action under the Michigan equal protection clause. *See Lewis v. State*, 629 N.W.2d 868, 868, 872 (Mich. 2001). The court reasoned,

On its face, the implementation power of Const. 1963, art. 1, § 2 is given to the Legislature. Because of this, for this Court to implement Const. 1963, art. 1, § 2 by allowing, for example, money damages, would be to arrogate this power given expressly to the Legislature to this Court. Under no recognizable theory of disciplined jurisprudence do we have such power.

*Id.* at 871. Noting the distinction blurred by the majority in this case, the Michigan Supreme Court added,

[O]ur holding should not be construed as a demurral to the traditional judicial power to invalidate legislation or other positive governmental action that directly violates the equal protection guarantee of Const. 1963, art. 1, § 2. There is obviously a distinction between a judicial decree *invalidating* unconstitutional governmental action and the adoption of judicially created doctrines that effectively serve as de facto statutory enactments to implement Const. 1963, art. 1, § 2.

*Id.* at 871–72 (footnote omitted).

During the debates on adoption of the 1857 Constitution, the delegates appeared to recognize that constitutional damages suits against the State required separate authorization. At one point the delegates discussed adding language authorizing damage suits against the State if the State took away privileges or immunities it had previously granted. 1 *The Debates of the Constitutional Convention of the State of Iowa* 104 (W. Blair Lord rep., 1857), www.statelibraryofiowa.org/services /collections/law-library/iaconst. One delegate criticized the proposal as not going far enough, observing that "a citizen cannot sue the State. Where is he to go, then, to get his damages?" *Id.* at 105.

When it was then proposed that the provision be strengthened to expressly state that "the State shall be liable to an action at law in any court of record in this State," *id.*, another delegate responded,

> I am opposed to the amendment . . . for I do not want to ingraft anything upon the Constitution of the State of Iowa, that will be liable to get the State into an innumerable number of law suits. I do not believe in having the State dragged into the courts of the State. I am opposed to this thing here, and if anything of the sort is to be done, let the legislature make the necessary provision for it.

*Id.* at 106. A third delegate commented, "I do not believe it would be politic to make a constitutional law that will be the means of getting the State into law suits, the end of which no man can foretell." *Id.* A fourth delegate spoke on "the impolicy of making the State a party to a suit at law, in courts of justice[;] and every mind recognizes the impolicy of that practice." *Id.* at 110.

In the end, the provision was not adopted. *Id.* at 115. But the key point is this: these framers understood the State generally could not be

sued, even on a constitutional claim, without express authorization from the constitution itself or from the general assembly.

Consistent with the text of article XII, section 1 and this history, we have said on a number of occasions that the provisions of the Iowa Constitution are not self-executing. *See Van Baale v. City of Des Moines*, 550 N.W.2d 153, 157 (Iowa 1996) ("Although the equal protection clause creates a constitutionally protected right, it is not self-enforcing. Equal protection rights may be enforced only if the Congress or a legislature provides a means of redress through appropriate legislation." (citation omitted)); *State ex rel. Halbach v. Claussen*, 216 Iowa 1079, 1091, 250 N.W. 195, 200 (1933) ("The Constitution . . . is in no sense self-executing. Its mandates directed to the Legislature must be obeyed in accordance with the provisions made thereby for that purpose."); *Edmundson v. Indep. Sch. Dist.*, 98 Iowa 639, 646, 67 N.W. 671, 673 (1896) ("The constitutional provision is not self-executing or self-enforcing. It is purely a matter of defense to recovery upon a contract . . . ."); *see also Lough v. City of Estherville*, 122 Iowa 479, 485, 98 N.W. 308, 310 (1904) ("While a violation of the Constitution in the respect in question is to be condemned, and the courts should interfere to prevent such violation whenever called upon so to do, yet we are not prepared to adopt the suggestion that an action for damages may be resorted to, as affording a proper means of redress, where a violation has been accomplished.").

The majority confuses the matter by conflating the first and second sentences of article XII, section 1. When we said in the foregoing cases that the Iowa Constitution was not self-executing, we did not mean that it could not be raised *as a defense* (or a negative check, the phrase I used earlier). In fact, *Edmundson* and *Halbach* make the point that the Iowa Constitution may be raised as a "defense," *Edmundson*, 98 Iowa at

647, 67 N.W. at 673, and "must be obeyed," *Halbach*, 216 Iowa at 1091, 250 N.W. at 200. All we said is that you can't bring an affirmative lawsuit for damages for violating the Iowa Constitution absent statutory authority or a common law tort. The majority cites no Iowa case that has ever recognized such a claim.

The majority tries to sidestep the actual text of article XII, section 1 by citing to other provisions in the Iowa Constitution expressly giving the general assembly authority to legislate in particular areas. I don't follow the majority's argument. The majority can't mean these are the *only* areas where the general assembly can pass laws. So what is their point?

Typically, these other provisions serve one of two purposes. Some specify subject areas where the legislature *must* pass laws, such as the election of an attorney general and the organization of corporations. *See, e.g.,* Iowa Const. art. V, § 12; *id.* art. VIII, § 1. Others delineate areas where the legislature has greater discretion than usual. *See, e.g., id.* art. I, § 9; *id.* art. II, § 7. Yet, in addition, and at the same time, the legislature is exclusively vested with plenary authority to pass whatever other laws it deems "necessary" to implement the Iowa Constitution. *See id.* art. XII, § 1.[10]

The majority also places considerable reliance on the heading "Schedule" in article XII. *See id.* art. XII. Based on this heading, the majority insists that the second sentence of article XII, section 1 is just a temporary provision relating to the "transition" to the 1857 Constitution.

---

[10]For example, contrast the language of article V, section 14 ("It shall be the duty of the general assembly to provide for the carrying into effect of this article, and to provide for a general system of practice in all the courts of this state."), with that in article XII, section 1.

This contention likewise seems to me flawed. The first sentence of article XII, section 1, Iowa's supremacy clause, is clearly *not* a transitional provision. *See Varnum v. Brien*, 763 N.W.2d 862, 875–76 (Iowa 2009) (discussing and relying upon the first sentence of article XII, section 1). So why would the very next sentence of section 1 be transitional? Significantly, a number of provisions of article XII have been omitted from the codified version of our constitution with the note that they were "transitional." *See* Iowa Const. art. XII (codified), *reprinted in* Iowa Code (2009) volume I at p. lvi. Section 1, however, is not among them. *See id.*

A glance back at our 1846 Constitution further undermines the majority's position. Like the 1857 Constitution, the 1846 Constitution had an article XIII entitled "Schedule." Iowa Const. art. XIII (1846). However, that article did *not* contain any counterpart to section 1. *See id.* In fact, no counterpart to article XII, section 1 can be found anywhere in the 1846 Constitution. The 1846 article XIII was limited to eight sections, all of which truly were transitional. *See id.* A logical conclusion is that our framers thought it was important for our 1857 constitution to include the nontransitory principles set forth in section 1 (after all, the United States Constitution has a supremacy clause), and decided that article XII was a convenient place to do so.

The majority also highlights the use of the word "this" in both sentences of article XII, section 1. I do not follow the point here, either. Section 1 uses this syntax because it is referring to the constitution that it is a part of, not some other constitution. "This" would be the normal syntax and is used in the Supremacy Clause of the United States Constitution. *See* U.S. Const. art. VI, cl. 2 ("This Constitution . . . shall be the supreme Law of the Land . . . .").

In the end, the majority offers no explanation for what the second sentence of section 1 *does* mean, if it doesn't have the meaning the district court gave it.

### III. The Majority Confuses Common Law Tort Damage Claims with Damage Claims Based Only on the Iowa Constitution. The Former Have Always Been Allowed; the Latter Have Not.

The majority asserts that we have previously allowed damage lawsuits for violations of the Iowa Constitution to proceed without legislative authorization. The majority is mistaken. What we have permitted are traditional common law tort claims, such as trespass, conversion, malicious prosecution, and abuse of process.

In *McClurg v. Brenton,* the mayor of Des Moines and "quite a retinue of followers" barged in on plaintiff's home in the middle of the night without a warrant, based on suspicion that the plaintiff had stolen a neighbor's chickens. 123 Iowa 368, 369, 98 N.W. 881, 881–82 (1904). "The matter being tried was the alleged trespass upon plaintiff's home . . . ." *Id.* at 374, 98 N.W. at 883. We held the plaintiff had submitted enough evidence to get to the jury and reversed the defense verdict for evidentiary errors, noting,

> Even with a warrant, the law of this state forbids a search in the nighttime, save upon a showing therefor, and upon special authority expressed in the writ. Code, § 5555. A right thus carefully guarded by the statute as well as by the common law is not to be lightly disregarded.

*Id.* at 372, 98 N.W. at 882. It takes considerable imagination, I believe, to read *McClurg* as authorizing damage claims directly under the Iowa Constitution.

*Krehbiel v. Henkle* involved a teacher who had to furnish a classroom at her own expense with the assistance of some parents. 142 Iowa 677, 678–79, 121 N.W. 378, 379 (1909). (Times do not change.) A

disgruntled parent whose cheap pictures were not returned at the end of the year caused a warrant to be issued, and the teacher's residence was entered and searched. *Id.* "Thereafter [the owner of the home] instituted this action for damages, alleging that in suing out said warrant and causing the search of his premises for alleged stolen property the [parent] acted willfully, maliciously, and without probable cause." *Id.* at 678, 121 N.W. at 379. We held on appeal that the case should have been submitted to the jury because "the evidence tends very clearly to show both malice and want of probable cause." *Id.* at 680, 121 N.W. at 380.

Although we did mention article I, section 8 of the Iowa Constitution, the cause of action was a recognized common law claim for trespass and malicious prosecution. *Id.* at 679–80, 121 N.W. at 379. Notably, the defendant was not a public official subject to article I, section 8, but a private party—i.e., the disgruntled parent. *Id.* at 678–79, 121 N.W. at 379.

The third case relied on by the majority, *Girard v. Anderson,* also was between private parties. 219 Iowa 142, 143, 257 N.W. 400, 400 (1934). The plaintiff bought a piano from the defendant but fell behind on the payments. *Id.* Two of the defendant's employees allegedly broke and entered into the plaintiff's home to repossess the piano. *Id.* at 144, 257 N.W. at 400. The plaintiff sued. *Id.* at 144–45, 257 N.W. at 401. We held the plaintiff had triable claims as to both trespass and conversion. *Id.* at 145, 257 N.W. at 401. The main issue in the case was whether the defendant could rely on language in the piano sales contract to justify his agents' entry into the plaintiff's home. *Id.* We decided otherwise:

> We are not willing to adopt a rule that will permit the seller under a contract of this kind to take the law into his own hands by forcibly retaking possession of property sold, where any resistance is offered by the purchaser.

*Id.* at 149, 257 N.W. at 403.

In the course of our opinion in *Girard*, we quoted article I, section 8, recognizing that it protects "the sacredness of the home." *Id.* at 148, 257 N.W. at 402. We also cited *McClurg* and *Krehbiel* and said, "A violation of the state and federal constitutional provisions against the unreasonable invasion of a person's home gives the injured party a right of action for damages for unlawful breaking and entering." *Id.* at 148, 257 N.W. at 403. But as in those two cases, the actual cause of action was an established one under the common law. *Id.* at 145, 257 N.W. at 401. To put it another way, these causes of action did not depend on the existence of article I, section 8, but were traditional common law claims and would have gone forward even if article I, section 8 were not part of our constitution. The majority's three cases need to be juxtaposed with the caselaw already discussed where we said the provisions of the Iowa Constitution are not self-executing.[11]

**IV. The ICRA Remedy for the Alleged Discrimination Is Exclusive and This Court Lacks Authority to Devise a Different Remedy That It Might Prefer.**

Even when direct damage lawsuits have been permitted under other state constitutions (i.e., constitutions that do not have a counterpart to article XII, section 1), they are typically not allowed when the legislature already has devised a remedial system for the same

---

[11]The court also mentions *State v. Tonn*, 195 Iowa 94, 191 N.W. 530 (1923), *abrogated on other grounds by State v. Cline*, 617 N.W.2d 277, 291 (Iowa 2000). This, however, was a criminal case where our court rejected the applicability of the exclusionary rule in state criminal prosecutions. *Id.* at 107, 191 N.W. at 536. We did state, "A trespassing officer is liable for all wrong done in an illegal search or seizure." *Id.* at 106, 191 N.W. at 535. We did not discuss the specific *basis* for liability—whether it was trespass or the Iowa Constitution. The use of "trespassing" in our sentence suggests the former. We also did not discuss whether liability meant damages liability.

wrong. Employment discrimination claims in Iowa are an area where the legislature has devised such a remedial scheme.

In Iowa, the general assembly has directed that a person "claiming to be aggrieved by an unfair or discriminatory practice must initially seek an administrative relief," and thereafter may bring a civil action under the ICRA. *See* Iowa Code § 216.16(1), (2). This remedy is "exclusive." *Smidt v. Porter*, 695 N.W.2d 9, 17 (Iowa 2005) ("To the extent the ICRA provides a remedy for a particular discriminatory practice, its procedure is exclusive and the claimant asserting that practice must pursue the remedy it affords."); *see Northrup v. Farmland Indus., Ind.*, 372 N.W.2d 193, 197 (Iowa 1985) (stating that "the procedure under the civil rights act is exclusive, and a claimant asserting a discriminatory practice must pursue the remedy provided by the act"); *see also Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 858 (Iowa 2001) (reiterating *Northrup*'s holding and citing additional cases); *Kingsley v. Woodbury Cty. Civil Serv. Comm'n*, 459 N.W.2d 265, 266 (Iowa 1990) (noting that "the exclusive remedy for complainants asserting a discriminatory act lies with the procedure provided in [the ICRA]").

In the analogous federal context, courts have uniformly held that Title VII of the federal Civil Rights Act of 1964 provides the exclusive remedy for claims of discrimination in federal employment. *See Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835, 96 S. Ct. 1961, 1969 (1976). *Bivens* actions for employment discrimination are therefore barred. *Zeinali v. Raytheon Co.*, 636 F.3d 544, 549 n.3 (9th Cir. 2011) ("Title VII 'provides the exclusive judicial remedy for claims of discrimination in federal employment.'" (quoting *Brazil v. U.S. Dep't of Navy*, 66 F.3d 193, 197 (9th Cir. 1995))); *Ethnic Emps. of Library of Cong. v. Boorstin*, 751 F.2d 1405, 1415 (D.C. Cir. 1985) ("[F]ederal employees may not bring

suit under the Constitution for employment discrimination that is actionable under Title VII.").

The lead opinion glosses over the Supreme Court's substantial reluctance to coin new causes of action based on the federal constitution post-*Bivens*. With nothing more than a string cite, the lead opinion discounts over three decades of Supreme Court jurisprudence declining to expand *Bivens* remedies beyond the specific circumstances of *Bivens*, *Davis*, and *Green*. *See Ziglar v. Abbasi*, 582 U.S. ___, 137 S. Ct. 1843, 1857, 2017 WL 2621317, at *12 (June 19, 2017) ("[T]he Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 129 S. Ct. 1937, 1948 (2009))); *Minneci v. Pollard*, 565 U.S. 118, 120, 131, 132 S. Ct. 617, 620, 626 (2012) (rejecting *Bivens* action under Eighth Amendment against employees of privately operated federal prison); *Wilkie v. Robbins*, 551 U.S. 537, 555, 127 S. Ct. 2588, 2600 (2007) (declining to allow *Bivens* action by private landowner under Due Process Clause for Bureau of Land Management interference with property rights); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 63, 74, 122 S. Ct. 515, 517, 523 (2001) (determining no *Bivens* remedy unavailable against a private corporation operating a halfway house under government contract); *F.D.I.C. v. Meyer*, 510 U.S. 471, 486, 114 S. Ct. 996, 1006 (1994) (declaring that no *Bivens* claim could be brought against a governmental agency); *Schweiker v. Chilicky*, 487 U.S. 412, 429, 108 S. Ct. 2460, 2471 (1988) (stating no *Bivens* claim available under Due Process clause for employees who were denied Social Security benefits); *United States v. Stanley*, 483 U.S. 669, 686, 107 S. Ct. 3054, 3065 (1987) (declining to allow *Bivens* claim in military context); *Bush v. Lucas*, 462 U.S. 367, 368, 103 S. Ct. 2404, 2406 (1983) (declining to allow *Bivens* claim under the First Amendment

for federal employee who was demoted); *Chappell v. Wallace*, 462 U.S. 296, 304, 103 S. Ct. 2362, 2368 (1983) (rejecting *Bivens* claim because of special factors counseling hesitation in context of the military).

In general, the Supreme Court has determined that "[s]o long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability." *Malesko*, 534 U.S. at 69, 122 S. Ct. at 520; *see also Minneci*, 565 U.S. at 129, 132 S. Ct. at 625 (stating even though other remedies may "prove less generous" by capping damages, forbidding emotional distress damages, or imposing procedural obstacles, it could not find a "sufficient basis to determine state law inadequate"); *Wilkie*, 551 U.S. at 553, 127 S. Ct. at 2600 ("In sum, Robbins has an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints.").

Other state courts have followed the same reasoning in declining to layer a state constitutional remedy on top of an existing state statutory remedy. *See Kelley Prop. Dev., Inc. v. Town of Lebanon*, 627 A.2d 909, 922 (Conn. 1993) ("[W]e should not construe our state constitution to provide a basis for the recognition of a private damages action for injuries for which the legislature has provided a reasonably adequate statutory remedy."); *see also Lowell v. Hayes*, 117 P.3d 745, 753 (Alaska 2005) ("[W]e will not allow a constitutional claim for damages, 'except in cases of flagrant constitutional violations where little to no alternative remedies are available.'" (quoting *Dick Fischer Dev. No. 2, Inc. v. Dep't of Admin.*, 838 P.2d 263, 268 (Alaska 1992))); *Katzberg v. Regents of Univ. of Cal.*, 58 P.3d 339, 356 (Cal. 2002) (reasoning that the availability of adequate alternative remedies "militates against judicial creation of" a constitutional remedy); *Bd. of Cty. Comm'rs v. Sundheim*, 926 P.2d 545,

553 (Colo. 1996) (en banc); *Baker v. Miller*, 636 N.E.2d 551, 559 (Ill. 1994); *Rockhouse Mountain Prop. Owners Ass'n v. Town of Conway*, 503 A.2d 1385, 1388 (N.H. 1986); *Provens v. Stark Cty. Bd.*, 594 N.E.2d 959, 965–66 (Ohio 1992); *Spackman ex rel. Spackman v. Bd. of Educ.*, 16 P.3d 533, 539 (Utah 2000) ("[W]e urge deference to existing remedies out of respect for separation of powers' principles."); *Shields v. Gerhart*, 658 A.2d 924, 933 (Vt. 1995) ("We have been cautious in creating a private damage remedy even where the Legislature has provided no alternative civil remedy.").

It is instructive to consider cases in which, as here, employment discrimination was the alleged wrong. The Ohio and Illinois Supreme Courts, as well as a well-reasoned federal district court opinion interpreting New York law, have all concluded that when a plaintiff's constitutional employment discrimination claim can also be pursued under the state's civil rights statutes, no separate constitutional claim is available.

Thus, in *Provens v. Stark County Board*, the Ohio Supreme Court declined to recognize an independent cause of action under the Ohio Constitution for compensatory and punitive damages for discrimination. 594 N.E.2d at 965–66. The plaintiff in *Provens* was a teacher at a state-run school. *Id.* at 959–60. In her complaint, Provens alleged that supervisors at the facility "had harassed, discriminated against, and disciplined her," and further retaliated against her because she had initiated a lawsuit against employees of the board. *Id.* at 960. Provens sought injunctive relief, compensatory damages, and punitive damages. *Id.* The trial court granted summary judgment in favor of the state, in part because "it would be inappropriate for the court to create a new judicial remedy." *Id.* at 961.

On appeal, the Ohio Supreme Court affirmed. *Id.* at 966. Although the court noted that Provens had not specified which of her rights had allegedly been violated, after reviewing the record the court determined "a significant basis for the allegations contained in plaintiff's complaint were harassment claims with racial connotations." *Id.* at 964. Relying on the United States Supreme Court decision in *Bush*, the court reasoned that the relevant question was not "what remedy the court should provide for a wrong that would otherwise go unredressed," but instead, "whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue." *Id.* at 963 (quoting *Bush*, 462 U.S. at 388, 103 S. Ct. at 2416–17). Accordingly, the court pointed out that the Ohio civil rights act "does provide the plaintiff with some meaningful available relief." *Id.* at 963; *see* Ohio Rev. Code Ann. ch. 4112 (West, Westlaw current through 2017 files 6, 8, and 9 of 132d Gen. Assemb.). Specifically, under Ohio law, if the Civil Rights Commission determines that an employer has engaged in an unlawful discriminatory practice, the commission may order injunctive relief or any other action "including, but not limited to, hiring, reinstatement, or upgrading of employees with, or without, back pay." *Provens*, 594 N.E.2d at 964 (quoting Ohio Rev. Code Ann. § 4112.05(G)). The court further noted that the plaintiff may have rights under the state's collective bargaining laws. *Id.* at 965.

With these principles in mind, the Ohio Supreme Court concluded,

> While the remedies provided the plaintiff here through the administrative process of a hearing before the [Civil Rights Commission] and through the arbitration process under the collective bargaining agreement do vary from the

remedies that might be available through a civil proceeding, such difference shall not be controlling where, in the totality, it may be concluded that the public employee has been provided sufficiently fair and comprehensive remedies. . . .

. . . .

. . . [I]t is not incumbent upon this court to engage in the type of comparative analysis of the relative merits of various remedies that is invited by appellant. Rather, the more appropriate course for this court is to defer to the legislative process of weighing conflicting policy considerations and creating certain administrative bodies and processes for providing remedies for public employees such as appellant.

We hold, therefore, that public employees do not have a private cause of civil action against their employer to redress alleged violations by their employer of policies embodied in the Ohio Constitution when it is determined that there are other reasonably satisfactory remedies provided by statutory enactment and administrative process.

*Id.* at 965–66.

Similarly, in *Baker,* the Illinois Supreme Court rejected an employment discrimination claim for compensatory and punitive damages brought directly under article I, section 17 of the Illinois Constitution. 636 N.E.2d at 552, 559. The court noted at the outset that the guarantees of that constitutional provision—freedom from discrimination in housing and employment—had been legislatively implemented through the Illinois Human Rights Act. *Id.* at 553. The court recognized that the Act was the exclusive remedy in Illinois for employment discrimination, and "[t]herefore, a covered employee [under that Act] may not bring a private cause of action to recover damages for a violation of his rights under article I, section 17." *Id.* at 554. The main issue in *Baker* was whether or not the plaintiff was covered under the Act. *See id.* Hence, after concluding she was covered, the court reasoned she was precluded from bringing a constitutional claim, in part because the Act provided the plaintiff with "a comprehensive and

systematic mechanism for the investigation and disposition of discrimination claims." *Id.* at 559.

Likewise, in *Muhammad v. New York City Transit Authority*, the court rejected the plaintiff's attempt to constitutionalize her discrimination claims against her employer, a public transit authority. 450 F. Supp. 2d 198, 209–12 (E.D.N.Y. 2006). The complaint raised various claims under federal law, state law, and the New York Constitution, several of which were subject to a pretrial motion to dismiss. *Id.* at 202.

Regarding the state constitutional claim, the court noted that the New York Court of Appeals had previously recognized a damages remedy under the state's equal protection clause in *Brown v. State*, 674 N.E.2d 1129, 1141 (N.Y. 1996). *Muhammad*, 450 F. Supp. 2d at 210–11. However, as the federal district court explained, "the Court of Appeals subsequently characterized *Brown* as creating only a 'narrow remedy.' " *Id.* at 211 (quoting *Martinez v. City of Schenectady*, 761 N.E.2d 560, 563 (N.Y. 2001)). "In *Brown* itself, neither declaratory nor injunctive relief was available to the plaintiffs . . . . For those plaintiffs it was damages or nothing." *Id.* (quoting *Martinez*, 761 N.E.2d at 563). Hence, the district court contrasted *Brown* with the potential avenues available to the plaintiff in order to remedy employment discrimination—namely, New York Human Rights Law. *Id.* at 212. The court concluded,

> Defendant specifically notes that New York Human Rights Law "prohibits discrimination in employment based on religion, and expressly provides a private right of action for an employee allegedly discriminated against on the basis of his or her religion." Future, similar constitutional violations may be deterred if plaintiff successfully exploits that avenue. Accordingly, recognition of a State constitutional tort is unnecessary in this case to afford plaintiff a remedy. [The claim] is, therefore, dismissed.

*Id.* (citations omitted).

Along the same lines, other state courts have allowed constitutional claims in the employment context only when there appears to be no available statutory remedy. In *Corum v. University of North Carolina*, the court indicated that the plaintiff had a direct damages remedy against his employer under the state constitutional provision protecting freedom of speech. 413 S.E.2d 276, 290 (N.C. 1992). However, the court noted the "critical limitation[ ]" that the court "must bow to established claims and remedies where these provide an alternative to the extraordinary exercise of [the judiciary's] inherent constitutional power." *Id.* at 291. Similarly, in *Peper v. Princeton University Board of Trustees*, the court recognized the constitutional cause of action, but only after concluding that the plaintiff's private-university employer was not a statutorily defined "employer" the applicable state discrimination laws. 389 A.2d 465, 474, 478 (N.J. 1978).

Maryland, which should be viewed as an outlier, has permitted discrimination claims under the Maryland state constitution despite the availability of a statutory remedy. *See Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 110–11 (Md. 2000). However, such state constitutional claims are subject to a statutory damages cap in the Local Government Tort Claims Act, which has been found applicable and enforceable to constitutional claims. *See Espina v. Jackson,* 112 A.3d 442, 462–63 (Md. 2015). Hence, even if we applied the Maryland approach in Iowa, the statutory bars to recovery of punitive damages in Iowa's government tort laws would be applicable and enforceable.

Here, as I have already noted, there is no dispute that Godfrey's employer, the State of Iowa, is an "employer" within the meaning of the

ICRA, *see* Iowa Code § 216.2(7), and thus in my view, the Act provides Godfrey with an adequate statutory remedy. The reasoning of the Ohio, Illinois, and New York courts is persuasive.

At best, article XII, section 1 might be read as *requiring* the general assembly to enact a damages remedy for constitutional violations. In the ICRA, the legislature has done that with respect to employment discrimination by state and local officials. Once the legislature has provided a remedy, it is not the role of the judiciary to provide a different remedy unless the existing remedy is so deficient as to amount to a denial of due process.[12]

The ICRA's language is mandatory and comprehensive. It provides that a person claiming to be aggrieved by a discriminatory act "must" follow the procedures therein. *Id.* § 216.16(1). We have no business striking down the mandatory and exclusive language in the ICRA, and I am glad we are not doing so today.

**V. The Lead Opinion Authorizes the State to be Sued for Punitive Damages in Disregard of Sovereign Immunity, Longstanding Tradition, and the Express Language of the Iowa Tort Claims Act.**

The lead opinion cites the availability of punitive damages as its justification for authorizing a parallel article I, section 6 track to the existing ICRA track. However, the Iowa Tort Claims Act (ITCA) does not allow punitive damages to be awarded against the State. *Id.* § 669.4. In other words, the State has not waived sovereign immunity as to punitive

---

[12]The lead opinion tries to pigeonhole the defendants' argument as one of classic preemption. The issue is not classic preemption in the sense that one law invalidates another law, but an issue of whether this court should establish a damages remedy of its own liking for allegedly unconstitutional conduct when the legislature has already done so.

damages, and I am not aware of an Iowa court having refused to honor this limit.[13]

A full discussion of this issue requires some clarity about the parties to this case. Originally, the attorney general certified that all individual defendants named in this petition were acting in their official capacities with respect to all claims. *See id.* § 669.5(2)(*a*); *Godfrey v. State,* 847 N.W.2d 578, 581 (Iowa 2014). This resulted in the dismissal of the individual defendants from the lawsuit. *Id.* at 581–82. However, in an earlier appeal, we reversed that dismissal in part. *Id.* at 588. We held the certification did not apply to claims brought against the individual defendants "in their individual capacities," i.e., to the extent these defendants were not "acting within the scope of their employment." *Id.* at 586. Still, we said that the individual defendants could "file a motion for summary judgment to resolve this issue." *Id.*

Subsequently, the defendants filed two separate motions for partial summary judgment. One was to dismiss the constitutional claims (Counts VI through IX) against all defendants based on the absence of a private right of action. The other was to dismiss the remaining claims against the individual defendants on the ground they had acted only in their official, not individual, capacities. The first motion was granted and is the subject of the present appeal. The plaintiff then conceded he had no factual basis for opposing dismissal of any remaining claims against

---

[13]The lead opinion observes that the State did not discuss sovereign immunity in its appellate brief. If the lead opinion is trying to make a point about error preservation, it is simply wrong. The State was the appellee; Godfrey was the appellant. In his briefing, Godfrey did not argue punitive damages as a reason for allowing discrimination claims based on article I, section 6 in Iowa. The State thus had no opportunity—let alone the obligation—to rebut an argument that Godfrey did not make, and that was developed for the first time in today's lead opinion.

the individual defendants, so those claims were voluntarily dismissed. As a result, the State of Iowa is presently the only defendant in this case.

While today's decision has the effect of reinstating some of the constitutional claims, those claims appear to involve exclusively actions taken by the defendants in their *official* capacities. Count VI under article I, section 9 of the Iowa Constitution challenges the conduct of the defendants in "demanding Plaintiff's resignation" and "drastically reducing Plaintiff's salary." Count VII, likewise brought under article I, section 9, alleges the defendants "deprived Plaintiff of a protected liberty interest by stigmatizing Plaintiff, by publicly and falsely claiming that their illegal and unreasonable demands for his resignation and ultimate reduction in his pay were due to Plaintiff's poor work performance." Count IX alleges that the defendants deprived the plaintiff of equal protection in violation of article I, section 6 when they slandered the plaintiff and reduced his salary.[14]

Thus, when the dust settles below, I think it is clear that the State will remain the only defendant. Regardless of the ultimate merits of the plaintiff's constitutional claims, they concern actions taken by the individual defendants in their official capacities. Any request to the plaintiff to resign or effort to reduce his salary would have been undertaken in that defendant's official capacity. And the plaintiff has already conceded, when he accepted the dismissal of his common law defamation claims, that he "has been unable to develop evidence that the individual Defendants were acting outside the scope of their employment" when they made the allegedly defamatory comments.

---

[14]The fourth constitutional claim, Count VIII, names only the State as a defendant.

Moreover, the plaintiff has previously conceded in this litigation that he is *not* entitled to punitive damages against the State. *See Godfrey*, 847 N.W.2d at 581 (quoting plaintiff's counsel). So if that is the justification for creating a direct cause of action against the State under the Iowa Constitution, it is a strange one. The plaintiff has already disavowed this ground.[15]

Under the doctrine of sovereign immunity, the State is immune from tort liability "[e]xcept where consent has been given by the legislature." *Montandon v. Hargrave Constr. Co.*, 256 Iowa 1297, 1299, 130 N.W.2d 659, 660 (1964). At the time of our State's founding, this doctrine was absolute: "No tort action could be maintained against the State or its agencies." Don R. Bennett, *Handling Tort Claims and Suits Against the State of Iowa: Part I*, 17 Drake L. Rev. 189, 189 (1968). Instead,

> one who suffered damage as the result of a negligent or wrongful act of a State employee had the limited choice of bringing suit against the employee personally or seeking redress from the Iowa General Assembly in the form of private relief.

*Id.*

As early as 1875, this court explored the meaning of sovereign immunity in *Metz v. Soule, Kretsinger & Co.*, 40 Iowa 236, 239–41 (1875). The plaintiff in *Metz* was an inmate at the State penitentiary who brought suit against the contractor of the facility for negligent construction. *Id.* at 236. Prior to filing suit, though, the plaintiff had petitioned the

---

[15]"[T]he State and its political subdivisions are not subject to punitive damages as the goals of punishment and deterrence are not served when punitive damages are imposed against the State, and the innocent taxpayer is ultimately the one who is punished." 57 Am. Jur. 2d *Municipal, County, School, and State Tort Liability* § 611, at 620 (2012).

general assembly and received a legislative appropriation consisting of monthly payments. *Id.* at 236–37. Although a jury rendered a verdict for the plaintiff against the defendant contractor, we reversed on appeal, concluding that the general assembly's earlier payment constituted an accord and satisfaction. *Id.* at 238 ("There can be but one satisfaction for a wrong.").

The defendant filed a petition for rehearing, "in which it [was] strenuously urged that the foregoing opinion ignores the maxim that, *The king can do no wrong.*" *Id.* at 239. In a denial of rehearing, we agreed with the State and reaffirmed our doctrine of sovereign immunity, clarifying the maxim means that any redress by the State "must be voluntary, and cannot be coerced." *Id.* at 240. Relying on the Blackstone Commentaries, we said,

> Perhaps [the maxim] means that, although the kind is subject to the passions and infirmities of other men, the constitution has prescribed no mode by which he can be made personally amenable for any wrong which he may actually commit. The law will, therefore, presume no wrong where it has provided no remedy.

*Id.* at 239–40 (quoting 1 William Blackstone, *Commentaries* *246). Hence, we said that Metz had "pursued the *decent* and *respectful mode* of appealing to the State legislature," and further that it was "clearly implied" in our opinion that "Metz could not have maintained an action against the State." *Id.* at 240. I don't read *Metz* as indicating that the Iowa Constitution provides plaintiffs a remedy, absent some kind of clear legislative action. *See also Wood v. Boone Cty.*, 153 Iowa 92, 100, 133 N.W. 377, 380 (1911) ("It is a general rule that, where a governmental

duty rests upon a state or any of its instrumentalities, there is absolute immunity in respect to all acts or agencies.").[16]

In 1965, the general assembly did partially waive the State's sovereign immunity in the ITCA. *See* 1965 Iowa Acts ch. 79, § 4 (codified as amended at Iowa Code section 669.4). Since then, we have recognized that the State's waiver is "limited" to the boundaries of the ITCA. *Hook v. Trevino*, 839 N.W.2d 434, 439 (Iowa 2013); *accord Graham v. Worthington*, 259 Iowa 845, 857, 146 N.W.2d 626, 634 (1966); *see also Jones v. Univ. of Iowa*, 836 N.W.2d 127, 141–42 (Iowa 2013) ("The waiver of sovereign immunity, however, applies only to the actions specified in the statute."). For example, section 669.14 defines numerous claims as to which the State retains its immunity from tort liability. *See* Iowa Code § 669.14. In *Lloyd v. State*, we explained,

> Section [669.14] makes clear the legislature did not intend the Iowa Tort Claims Act to be a waiver of sovereign immunity in all instances. It was designed primarily to remove sovereign immunity for suits in tort with certain specified exceptions set out in the statute.
>
> Under the Act the State or its agencies is subject to suit in tort as an individual only in the manner and to the extent to which consent has been given by the legislature. The immunity of the State is from suit rather than from liability and remains the rule rather than the exception.

---

[16]This did not, of course, leave our courts powerless to remedy illegal and unconstitutional acts through injunctive relief. As we said in one case:

> Appellant does not attempt to obtain money from the state, interfere with its sovereignty, or the administration of its affairs through proper agencies. On the other hand, he only wants to protect his property from destruction by the agents of the state, who exceed their authority and thereby seek to take it from him, not with, but without, legal right and in opposition to a legislative guarantee. Clearly the power of the courts to restrain state officials from violating plain provisions of the statute and Constitution is in no way derogatory to the general and well-recognized rule that the state cannot be sued without its consent.

*Hoover v. Iowa State Highway Comm'n*, 207 Iowa 58, 61, 222 N.W. 438, 440 (1928).

251 N.W.2d 551, 555 (Iowa 1977).

As a result, we have consistently held that when the general assembly has not waived immunity to suit, any damage claim against the State or its officials is barred. *See, e.g., Jones*, 836 N.W.2d at 141–43; *Minor v. State*, 819 N.W.2d 383, 406 (Iowa 2012) ("[W]here the basis of the plaintiff's claim is the functional equivalent of a cause of action listed in section 669.14(4), the government official is immune."); *Sanford v. Manternach*, 601 N.W.2d 360, 371 (Iowa 1999); *Magers-Fionof v. State*, 555 N.W.2d 672, 675 (Iowa 1996); *Genetzky v. Iowa State Univ.*, 480 N.W.2d 858, 861 (Iowa 1992); *Engstrom v. State*, 461 N.W.2d 309, 320 (Iowa 1990); *Greene v. Friend of Ct.*, 406 N.W.2d 433, 436 (Iowa 1987); *North v. State*, 400 N.W.2d 566, 570 (Iowa 1987); *Montandon*, 256 Iowa at 1299, 130 N.W.2d at 660 ("Except where consent has been given by the legislature the state is immune from suit."); *Yoerg v. Iowa Dairy Indus. Comm'n*, 244 Iowa 1377, 1387, 60 N.W.2d 566, 571 (1953).

All this authority is brushed away, as the lead opinion today finds a previously undiscovered *right* to recover punitive damages against the State as long as the lawsuit is couched in constitutional terms. But our precedent is to the contrary. We earlier concluded that except as waived by the legislature, sovereign immunity applies even when an alleged deprivation of constitutional rights is involved. For example, in *Sanford*, we affirmed the dismissal of the plaintiff's damages claim "for the deprivation of good-conduct time" in prison, something that clearly involved a liberty interest. 601 N.W.2d at 370–72. Similarly, the plaintiff in *Yoerg* claimed that a state commission's failure to remit an excise tax resulted in a violation under the Iowa Constitution. 244 Iowa at 1379, 60 N.W.2d at 567. Nonetheless, we determined "the suit against the

commission was substantially against the state, which was immune therefrom." *Id.* at 1387, 60 N.W.2d at 571.

Recognizing that the doctrine of sovereign immunity may bar constitutional damage claims is not some novel concept. In *Figueroa v. State,* the Hawaii Supreme Court declined to create a private right of action for damages based on provisions of the Hawaii Constitution, in part because the court determined it was "not free to abolish the State's sovereign immunity." 604 P.2d 1198, 1205 (Haw. 1979). Notably, the *Figueroa* court reached that conclusion even though the state constitution expressly provided that all of its provisions are self-executing. *Id.* at 1206. The court reasoned:

> The self-executing clause only means that the rights therein established or recognized do not depend upon further legislative action in order to become operative. No case has construed the term "self-executing" as allowing money damages for constitutional violations. More importantly, in a suit against the state, there cannot be a right to money damages without a waiver of sovereign immunity and we regard as unsound the argument that all substantive rights of necessity create a waiver of sovereign immunity such that money damages are available.

*Id.* (citations omitted). Still other state supreme courts have held similarly. *See State Bd. of Educ. v. Drury*, 437 S.E.2d 290, 294 (Ga. 1993) ("Although a citizen may be entitled to seek enforcement of his constitutional rights, the means of that enforcement does not necessarily take the form of a recovery of damages against the state."); *Livingood v. Meece,* 477 N.W.2d 183, 190 (N.D. 1991) ("[T]his court has specifically applied sovereign immunity as a bar to a direct cause of action against the state based on the alleged violation of state constitutional provisions, assuming that such a cause of action exists."); *Rockhouse Mountain Prop. Owners Ass'n,* 503 A.2d at 1389 (rejecting a claim for damages under the due process and equal protection clauses of the state constitution in part

because of "the incompatibility of that remedy with the limited municipal and official immunity that our cases have recognized as desirable"); *see also Garcia v. Reyes*, 697 So. 2d 549, 550 (Fla. Dist. Ct. App. 1997) ("To allow Garcia to bring a cause of action based on a violation of our state's constitution . . . would extend the waiver of sovereign immunity beyond the stated intent of the statute.").[17]

The lead opinion goes a step further. Not only does it allow actual damages against the State without the State's consent, it also refers to "[t]he necessity of the availability of punitive damages" in justifying a direct action under the Iowa Constitution. Of course, the lead opinion can't make this jump using Iowa law or our precedent—we have "clearly and repeatedly" concluded that punitive damages cannot be awarded under the ICRA, *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (Iowa 2013), and the legislature has plainly declared that "the state shall not be liable . . . for punitive damages" under the ITCA. Iowa Code § 669.4; *see also Young v. City of Des Moines*, 262 N.W.2d 612, 622 (Iowa 1978) (noting that punitive damages are "specifically precluded" under the ITCA), *overruled on other grounds by Parks v. City of Marshalltown*, 440 N.W.2d 377, 379 (Iowa 1989); *Speed v. Beurle*, 251 N.W.2d 217, 219 (Iowa 1977) ("The state's immunity for torts of its employees was waived as to compensatory damages but not as to punitive damages . . . .").

---

[17]The lead opinion claims that our territorial supreme court was "well aware" of the English practice of awarding damages for constitutional violations because we cited *Entick v. Carrington*, 95 Eng. Rep. 807 (C.P. 1765), in an 1855 decision. *See Sanders v. State*, 2 Iowa 230, 239 (1855). A closer examination of *Sanders* shows that we relied on *Entick* in striking down a statute that we determined operated as a general warrant in violation of article I, section 8 of the Iowa Constitution. *Id.* at 239–43 (reasoning that general warrants had been "entirely unknown" "since the decision of Lord Camden, in [*Entick*] *v. Carrington*"). In other words, *Entick* was cited for an entirely different point in 1855 than the lead opinion cites it for today.

Here the lead opinion backs itself into a corner. Godfrey's constitutional damage claims are still "claims" against State officials within the meaning of Iowa Code chapter 669. *See* Iowa Code § 669.2(3)(*b*) (defining "claim" as "[a]ny claim against an employee of the state . . . caused by the negligent or wrongful act or omission of any employee"). But punitive damages are expressly barred. *Id.* § 669.4.

While there's no question that Iowans have long been able to recover punitive damages *in general, see Cochran v. Miller*, 13 Iowa 128, 131 (1862), conspicuously absent from the majority's opinion is any discussion of precedent from this court allowing punitive damages *against the State.*

We have also previously held that there is no "vested right" to punitive damages. *Shepherd Components, Inc. v. Brice Petrides-Donohue & Assocs.*, 473 N.W.2d 612, 619 (Iowa 1991) (upholding the constitutionality of Iowa Code section 668A.1). The legislature can limit punitive damages even in a suit between two private parties. *See id.* If punitive damages are not a matter of right, how can the mere unavailability of such damages render a remedy constitutionally inadequate?

If the lead opinion were correct that there is a constitutional right to recover punitive damages from the State in appropriate cases, I am at a loss to understand how that would work in the real world. Let's assume that a plaintiff could demonstrate that the defendant's actions "constituted willful and wanton disregard," Iowa Code § 668A.1(1)(*a*), but not that the conduct was "directed specifically at the claimant, or at the person from which the claimant's claim is derived." *Id.* § 668A.1(1)(*b*). In that case, the trial court may direct up to twenty-five percent of the punitive damages to be awarded to the claimant, "with the remainder of

the award to be ordered paid into a civil reparations trust fund *administered by the state court administrator.*" *Id.* § 668A.1(2)(*b*) (emphasis added). So would most of the award cycle back to the State (although admittedly to a special fund)? Or does section 668A.1 even apply? As we have seen, the lead opinion's constitutional bulldozer has already pushed aside section 216.16(1)'s exclusivity language and section 669.4's bar on punitive damages. Would it also get to knock down section 668A.1?

Another question arises. How is a jury supposed to assess the "financial worth" of the State in setting the punitive damage award? *See McClure v. Walgreen Co.*, 613 N.W.2d 225, 233 (Iowa 2000). Will we have jurors examining the State budget?

And there is no logical reason to draw the line at punitive damages. The lead opinion amounts to a judicial declaration of defiance. The lead opinion signals that it will not be constrained by anything the legislature does and can devise any and all damage remedies it deems suitable and proper for alleged constitutional violations. This principle seems to lack any boundary. Can the court provide for a ten-year statute of limitations? Can the court eliminate any and all forms of immunity?

At this point, a majority of this court has not decided that punitive damages may be awarded against the State on a constitutional claim. As I have tried to show, the availability of punitive damages would be a reason *not* to allow direct constitutional claims against the State.

**VI. The Impact of Today's Decision on this Case May be Limited, but It Will Have Wide-Reaching Effects Throughout State and Local Government.**

Today's decision may not end up altering the result in this case. The amici urge us to dispose of the due process claims on independent

grounds. They argue that a high-level state policymaking official such as a workers' compensation commissioner has no due process right to a particular salary, no due process right to be free from criticism for "poor work performance," and no due process right to be insulated from "partisan" political action. These arguments weren't advanced by the defendants, so they are not addressed by the majority. Still, they remain open issues in this case.

Additionally, the plaintiff's counsel conceded at oral argument that if the defendants reduced the plaintiff's salary not because of his sexual orientation or his political affiliation, but simply because they disagreed with his policies as workers' compensation commissioner, there would be no constitutional claim.

While the impact of today's decision in *this* case may be limited, there should be no doubt about its far-reaching effects elsewhere. I anticipate many claims from current and former inmates seeking damages for wrongful incarceration. True, if you read the Iowa Code, the State has not waived sovereign immunity as to such claims except in the limited circumstances presented by chapter 663A. *See* Iowa Code §§ 663A.1, 669.14(4). But now an inmate can bring a direct claim for damages under article I, section 10 (ineffective assistance of counsel), article I, section 9 (due process of law), or article I, section 17 (cruel and unusual punishment).

*Sanford* would now be decided differently; yet it is just one example. To give another illustration, in light of this court's juvenile sentencing decisions, I would expect individuals who have been resentenced because their earlier sentences violated article I, section 17 to seek damages for the constitutional violation.

For the foregoing reasons, I would affirm the district court.

Waterman and Zager, JJ., join this dissent.